United States Court of Appeals,

Fifth Circuit.

Nos. 96-50847, 96-50948.

Catherine A. GHIGLIERI, in her official capacity as Texas Banking Commissioner, Plaintiff-Appellee,

v.

SUN WORLD NATIONAL ASSOCIATION, El Paso, Texas, et al., Defendants,

Sun World National Association, El Paso, Texas; Eugene A. Ludwig, in his official capacity as United States Comptroller of the Currency, Defendants-Appellants.

July 22, 1997.

Appeals from the United States District Court for the Western District of Texas.

Before JOLLY, DUHÉ, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Comptroller of the Currency (the "Comptroller") allowed Sun World, National Association ("Sun World") to relocate its main banking office across a state line from Texas to New Mexico. Notwithstanding that Sun World's principal office would now be in New Mexico, the Comptroller further allowed Sun World to maintain its pre-existing branches in Texas, and to establish a new branch in Texas. The Texas Banking Commissioner (the "Commissioner") had other notions and persuaded the district court to enjoin both Sun World and the Comptroller. Sun World and the Comptroller appeal, seeking to have the Comptroller's decision to allow Sun World to operate in both New Mexico and Texas reinstated. The appeal presents a question of statutory interpretation and because the Comptroller's interpretation of the statute he administers is

reasonable, we defer to it. We grant the relief requested, vacate the judgment of the district court, and remand for entry of judgment in favor of the Comptroller.

I

A

Sun World is a national banking association that had its main office in El Paso, Texas. In addition to its main office, Sun World operated two branch banks in El Paso.

Sun World decided to move its main office from El Paso, Texas, to Santa Teresa, New Mexico, a distance of less than five miles. To achieve this end, Sun World submitted two applications to the Comptroller in 1996. The first application sought approval to move the main office from Texas to New Mexico and to maintain the pre-existing branches in Texas. The second application sought authorization to establish a new branch at the location of the former main office in Texas. The Commissioner objected to both applications. The Comptroller subsequently approved both applications, and Sun World operated in both states until enjoined by the district court.

B

The Commissioner filed this action in the district court[1] seeking to have the decision of the Comptroller set aside, to have Sun World enjoined from conducting interstate banking operations

---

[1]The Commissioner initially instituted the district court action against Sun World prior to the Comptroller's decisions on the applications. After the Comptroller ruled on the applications, the complaint was amended to include the Comptroller as a party.

2

and to have the Comptroller enjoined from approving any further applications of this type.

All parties filed motions for summary judgment. The district court heard arguments on the motions and granted the Commissioner's motion. The court rejected the Commissioner's argument that Sun World could not relocate its main office across a state line. The court, however, held that Sun World could not retain its Texas branches following relocation to New Mexico and that, consequently, neither could Sun World establish a new branch at the site of its former main office in Texas. Sun World and the Comptroller appeal.

II

A

Resolution of this appeal requires us to examine the provisions of and the interplay between two sections of a federal statute.[2] Section 30 effectively provides that Sun World can

---

[2]The statutes that govern this appeal are 12 U.S.C. § 30 and § 36. These statutes provide, in relevant part:

§ 30. Change of name or location

(b) Location change

Any national banking association, upon written notice to the Comptroller of the Currency, may change the location of its main office to any authorized branch location within the limits of the city, town, or village in which it is situated, or, with a vote of shareholders owning two-thirds of the stock of such association for a relocation outside such limits and upon receipt of a certificate of approval from the Comptroller of the Currency, to any other location within or outside the limits of the city, town, or village in which it is located, but not more than thirty miles beyond such limits.

(c) Coordination with section 36 of this title

In the case of a national bank which relocates the main office of such bank from one State to another State after May 31, 1997, the bank may retain and operate such branches within the State from which the bank relocated such office only to the extent authorized in section 36(e)(2) of this title.

12 U.S.C. § 30.

§ 36. Branch banks

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

(a) Lawful and continuous operation

A national banking association may retain and operate such branch or branches as it may have had in lawful operation on February 25, 1927, and any national banking association which continuously maintained and operated not more than one branch for a period of more than twenty-five years immediately preceding February 25, 1927, may continue to maintain and operate such branch.

(b) Converted State banks

(c) New branches

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by the language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

(e) Exclusive authority for additional branches

change the location of its main office to any location within thirty miles of El Paso upon the approval of the Comptroller and two-thirds of its shareholders. (One paragraph of the section relates specifically to the retention of branches after an interstate move, but is irrelevant to our case because it is applicable only to moves occurring after May 31, 1997.) Section 36 sets forth the requirements for the establishment of new branch

(1) In general

Effective June 1, 1997, a national bank may not acquire, establish, or operate a branch in any State other than the bank's home State ... or a State in which the bank already has a branch unless the acquisition, establishment or operation of such branch in such State by such national bank is authorized under this section or section 1823(f), 1823(k) or 1831(I) of this title.

(2) Retention of branches

In the case of a national bank which relocates the main office of such bank from one State to another State after May 31, 1997, the bank may retain and operate branches within the State which was the bank's home State ... before the relocation of such office only to the extent the bank would be authorized, under this section or any other provision of law referred to in paragraph (1), to acquire, establish, or commence to operate a branch in such State if—

(A) the bank had no branches in such State; or

(B) the branch resulted from—

(I) an interstate merger transaction approved pursuant to section 1831(u) of this title; or

(II) a transaction after May 31, 1997, pursuant to which the bank received assistance from the Federal Deposit Insurance Corporation under section 1823(c) of this title.

12 U.S.C. § 36.

5

banks. (Two paragraphs of § 36, which provide specific guidelines for the retention of branch banks upon relocation of a main branch across state lines, are also effective only with respect to banks relocating after May 31, 1997, and therefore inapplicable to this case.)

The Comptroller determined that under § 30 Sun World could relocate its main branch to New Mexico. The Comptroller further determined that because the move occurred before June 1, 1997, Sun World could retain its existing branches in Texas. The Comptroller then decided that § 36 authorized Sun World to create a new branch at the site of the former main office. The district court disagreed. It held that, although Sun World could move its main office to New Mexico under § 30(b),[3] it could not continue to operate the branches remaining in Texas. This conclusion—that Sun World could exist only in New Mexico—necessarily led to the holding that a new branch could not be established in Texas because such branching was not permitted under New Mexico banking law. We now turn to the task of resolving the questions of statutory interpretation posed by this appeal.

B

(1)

In this action, the Commissioner challenges the Comptroller's

---

[3]This holding is not seriously challenged by the Commissioner on appeal, and, to the extent that it is challenged, the appeal is without merit in the light of the express language of section 30(b) establishing a thirty-mile limitation on relocation without reference to state lines. Notably, a limitation requiring that the move be "within the same state" was deleted from the statute in 1959.

decision pursuant to the Administrative Procedures Act; we therefore review the decision of the Comptroller *de novo* to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Louisiana Envtl. Soc'y v. Dole,* 707 F.2d 116, 119 (5th Cir.1983).

The Supreme Court has set out the analysis to be applied in reviewing an agency's interpretation of the statute it administers. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). *Chevron* 's analysis applies to the case before us because the Comptroller is charged with the administration of the banking laws at issue. *Smiley v. Citibank (South Dakota), N.A.,* --- U.S. ----, ----, 116 S.Ct. 1730, 1732, 135 L.Ed.2d 25 (1996). The Supreme Court instructed as follows:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron* at 842-43, 104 S.Ct. at 2781-82. In reaching a determination whether Congress has spoken directly on an issue, courts are free to consider both the plain language and meaning of the statute and any pertinent legislative history. *Doyle v.*

7

*Shalala,* 62 F.3d 740, 745 (5th Cir.1995). The court should use traditional tools of statutory construction, and if the court can discern that Congress intended to address the precise question, then that intention must be given effect. *Chevron* at 843 n. 9, 104 S.Ct. at 2781 n. 9. If, however, the statute is silent on the precise issue then the agency's interpretation should be given "controlling weight." *See NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 255-59, 115 S.Ct. 810, 813-14, 130 L.Ed.2d 740 (1995). In such a case, the issue before the court "is not whether [the agency's interpretation] represents the best interpretation of the statute, but whether it represents a reasonable one."[4] *Smiley,* at ----, 116 S.Ct. at 1735.

We now apply these principles of construction to the statutes before us today.

## (2)

### (a)

First, we address whether, upon relocation of its main office to New Mexico, Sun World was permitted to retain its pre-existing branches in Texas. We initially look to the statute. The

---

[4]When faced with a question not addressed specifically by Congress, the Supreme Court has noted that

> It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering. As we observed only last Term, that practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws.

*Smiley,* at ----, 116 S.Ct. at 1733 (internal citations omitted).

8

authority for the relocation of Sun World's main office from El Paso to Santa Teresa is § 30(b). The only relevant restrictions imposed by that section are that the new site be within thirty miles of the original site, that the bank obtain the approval of the shareholders holding at least two-thirds of its stock and that a certificate of approval issue from the Comptroller.

Thus, the Comptroller argues that because there is no statutory language requiring divestiture of existing branches upon relocation of the main office the statute is clear on this issue. He argues that the absence of any such requirement indicates that Congress did not intend to affect the retention of branch banks upon relocation of the bank's main office. The Commissioner counters that the operation of branches—in all situations—is governed solely by § 36, and argues that there is no authority found in § 36 that would allow Sun World to retain its pre-existing branches upon relocation.

Neither party persuades us that Congress has clearly spoken to the precise issue before us today. Indeed it is plain, we think, that the statute is silent on this point. It is obvious that § 30 does not speak to the question of retention of branches after relocation. Although § 36 addresses branch banking, it fails completely to speak to the retention of branches upon relocation of the bank's main office. Section 36(a) speaks only to retention of branches owned in 1927, 36(b) speaks only to the retention of branches upon conversion of a state bank, and 36(c) speaks only to the establishment of new branches. As we have noted earlier, §

9

36(e) speaks to this precise question, but that section is effective only with respect to relocations occurring after May 31, 1997, and is therefore not applicable to our case. In short, both sections 30 and 36 are silent as far as our case today is concerned.

(b)

Having concluded that Congressional intent is not expressed on this specific issue, we turn now to determine whether the interpretation advanced by the Comptroller is a permissible one. *See Chevron* at 841-43, 104 S.Ct. at 2781; *Smiley,* at ----, 116 S.Ct. at 1735. For the reasons that follow, we conclude that the Comptroller reasonably interpreted the statutes.

Initially, the Comptroller's position is supported because, although there are specific enumerated conditions that must be satisfied before relocation of a main office, Congress did not provide that lawfully established pre-existing branches must be forfeited. In effect, the Commissioner's position would result in a deprivation of the lawfully acquired property interests of Sun World without express statutory authority. We doubt Congress would have intended such an extreme consequence in implied or oblique terms.

Indeed, when Congress did address the matter, it did so in express words. Sections 30(c) and 36(e)—added by the Riegle-Neal Act in 1994—specifically condition the retention of existing branches after out-of-state relocation of a main office upon the satisfaction of certain conditions, which focus on state law. *See*

10

12 U.S.C. §§ 30(c), 36(e). These provisions apply only to moves occurring after May 31, 1997, and, thus, have no direct impact on the case before us today. The addition of these sections, however, indirectly supports the Comptroller's position. The Supreme Court recently has noted that the imposition of a Congressional limitation on a national bank's authority is logical only if the banks already had the authority. *See NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257-59, 115 S.Ct. 810, 814, 130 L.Ed.2d 740 (1995). In other words, it makes no sense to impose conditions on the ability to retain existing branches following relocation of a main office unless that ability already existed in some fashion.[5]

The Conference Report accompanying the adoption of the Riegle-Neal Act also lends credence to the interpretation adopted by the Comptroller. The Report contained the following:

---

[5] We reject the Commissioner's argument that the addition of §§ 30(c) and 36(e) was a grant of power to the Comptroller and national banks never before enjoyed. This argument is nonsensical because, if carried to its conclusion, no relocating national bank previously had the authority to retain its pre-existing branches even if it simply moved its main office across the street. Further, under the Commissioner's argument, after June 1, 1997, only a bank relocating across state lines can retain branches under certain conditions while a bank relocating in the same state—which the new amendments do not address—apparently must divest its branches and apply to re-establish them under § 36(c). The obvious weakness of this interpretation stands in sharp contrast to the interpretation urged by the Comptroller: Until June 1, 1997, all banks may relocate in accordance with § 30(b) without divestiture of their lawfully established pre-existing branches; then, after that date, interstate relocations will be limited by the conditions of §§ 30(c) and 36(e). In any event, our inquiry is not which interpretation is preferred, but whether the Comptroller's interpretation is permissible. We think that it is indeed permissible.

The Comptroller of the Currency (OCC) has used the 30 mile relocation provision of the National Bank Act ... to approve several transactions which have permitted national banks to move their main offices to other States but to retain branches in the States left by the Main offices.[6]  Section 102(b)(2) amends the provision so that after June 1, 1997, a national bank relocating its main office to another state may maintain its branches in the first state only if those branches could have been established by a bank with its home State in the new State....

The Conferees are aware of the OCC procedures in permitting relocation across state lines.  The Conferees concur with those procedures, including the application of appropriate State law and authority.[7]  The Conferees expect the OCC to continue to follow those procedures until the provisions of Title I become fully applicable on June 1, 1997.

H.R. Conf. Rep. No. 651, 103d Cong., 2d Sess. 57 (Aug. 2, 1994) (footnotes added).  This statement suggests that Congress indeed viewed the practice of allowing retention of branches upon relocation under § 30(b) favorably and did not intend to end the practice until the effective date of the Riegle-Neal amendments.

We have found no indication, nor has the Commissioner provided

---

[6]These decisions are the Decision on the Applications of American Security Bank, N.A., Washington, D.C., and Maryland National Bank, Baltimore, Maryland (OCC Corporate Decision No. 94-05, Feb. 4, 1994), *reprinted in* [1993-94 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 89, 695 and the Decision on the Applications of First Fidelity Bank, N.A., Pennsylvania, Philadelphia, Pennsylvania, and First Fidelity Bank, N.A., New Jersey, Newark, New Jersey (OCC Corporate Decision No. 94-04, Jan. 10, 1994), *reprinted in* [1993-94 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 89, 644.  Both decisions relied upon the provisions of § 30(b) to conclude that a bank could retain its pre-existing branches after relocating its main office out-of-state, although both also provided alternative bases for the retention of the branches.

[7]Both decisions referred to by the legislative history, *see supra* note 6, involved questions of state law in the course of determining whether a new branch could be opened in the former home state.  *See* 12 U.S.C. § 36(c) (relying on state law to determine ability to open new branch).

us with any evidence, that the interpretation adopted by the Comptroller is unreasonable. Given that Congress has addressed branch retention in only two very limited circumstances—neither of which apply to main office relocations—we conclude that it is reasonable under § 30 and § 36 for the Comptroller to allow banks relocating before June 1, 1997, to retain their lawfully established pre-existing branches in their former home state.

The decision of the Comptroller on Sun World's first application therefore is reinstated: Sun World will be permitted to relocate its main office from El Paso, Texas, to Santa Teresa, New Mexico, and to continue to operate its two pre-existing branches in El Paso, Texas. We turn now to the second application and determine whether Sun World should be allowed to open a new branch at the site of its former main office in El Paso.

(3)

There is no dispute that this second question is governed by § 36(c); therefore, Sun World may open a new branch at the site of its former main office in accordance with the following:

> A national banking association may ... establish and operate new branches: (1) Within the limits of the city ... in which said association is *situated,* if such establishment and operation are at the time expressly authorized to State banks by the *law of the State in question* ....

12 U.S.C. § 36(c) (emphasis added). First, Sun World first must be "situated" in El Paso, Texas—the city in which it wishes to establish a new branch. Second, the banking laws of Texas—the law of the state in question—must be broad enough to allow a State bank located in El Paso to establish a new branch in the city. The

13

Comptroller held that for purposes of this section, Sun World was situated in both El Paso, Texas, and Santa Teresa, New Mexico, and therefore could establish a new branch in El Paso because such a branch would be authorized by the state law of Texas.

The Comptroller relied upon the interpretation of § 36 established by *Seattle Trust and Savings Bank v. Bank of California,* 492 F.2d 48 (9th Cir.1974), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974), to resolve this question. *Seattle Trust* involved a bank with its corporate headquarters in California and legally established branches in Seattle, Washington. The bank sought to establish a new branch in Seattle, and the Comptroller approved the application. *Id.* at 49. On appeal, the Ninth Circuit affirmed the decision of the Comptroller, holding that for purposes of § 36(c) the bank was situated in both California—the site of its corporate headquarters—and Washington—the site of its legally established branches. *Id.* at 51-52. The court then held that, because the bank was situated in Washington, that state's branching law controlled the question whether a new branch could be established in Seattle. *Id.* at 52.

We agree with the Comptroller that *Seattle Trust* is applicable to the facts before us today. As a result of our holding that Sun World is authorized to relocate its main branch to Santa Teresa, New Mexico, and to retain its branches in El Paso, Texas, Sun World occupies a position identical to the one occupied by the bank in *Seattle Trust.* In point of fact, Sun World actually is situated in both New Mexico *and* Texas. We therefore conclude

14

that the Comptroller's decision that Sun World was situated in El Paso for the purposes of § 36(c) is a reasonable interpretation of the statutory terms. Texas branching law therefore applies to determine whether Sun World may open a new branch in the city. Under that law, a State bank may "establish and maintain branches at any location" without geographic limit. *See* Tex.Rev.Civ. Stat. Ann. art. 342-3.201(a) & 342-3.203 (West Supp.1996). Sun World is entitled under § 36(c) to that same grant of branching authority and, thus, can establish a new branch at the site of its former main office. In short, we reinstate the Comptroller's decision on Sun World's second application, which sought authorization to establish a new El Paso branch.

### III

In conclusion, we find that the statutes at issue do not address the question of branch retention after relocation under § 30(b) to another state of a main office. Under *Chevron*, we give deference to the Comptroller's interpretation of the statutes if that interpretation is permissible. Finding the interpretation permissible, we accordingly defer and reinstate the decision of the Comptroller allowing the retention of the branches. With respect to Sun World's second application, we are persuaded by the rationale of *Seattle Trust* that the Comptroller's interpretation and application of the statute is reasonable and hold that after the relocation, Sun World is situated in both El Paso, Texas, and Santa Teresa, New Mexico, because it has retained its Texas branches. Thus, the creation of a new branch in El Paso, Texas is

15

governed by Texas law.  Texas law allows State banks to branch at-will;  therefore, the new branch is legally authorized under the portion of § 36(c) incorporating state law restrictions.

The decision of the district court is therefore VACATED and the case will be REMANDED to the district court for entry of judgment in favor of the Comptroller.[8]

VACATED and REMANDED for entry of judgment.

*   *   *   *   *   *

*   *   *   *   *   *

*   *   *   *   *   *

---

[8]Our holding today renders unnecessary any consideration of Sun World's appeal from the district court's award of attorneys' fees to the Commissioner. *See Ghiglieri v. Sun World, N.A., appeal docketed,* No. 96-50948 (5th Cir. Dec. 9, 1996), *consolidated for decision with* No. 96-50847 (5th Cir. May 12, 1997).