**FIDELITY BANK NATIONAL ASSOCIATION, Plaintiff,**

v.

**Jay and Sue ALDRICH, et al., Defendants and Third–Party Plaintiffs**

and

**OFFICE OF THE COMPTROLLER OF CURRENCY, Defendant,**

v.

**Warren T. AYRES, Pat S. Bolin N. Key Kolb, William C. Murphy and Stanley J. Scott.**

No. Civ.A. 3–95–2566–H.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 30, 1997.

Bruce Wayne Bowman, Jr., Karen Kohler Fitzgerald, Vial Hamilton Koch & Knox, Dallas, TX, for plaintiff.

William Clyde Odeneal, Logan Odeneal, Odeneal & Odeneal, Dallas, TX, James Knight Johnson, Law Office of James K Johnson, Dallas, TX, William Odeneal, Law Office of William Odeneal, Dallas, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, Senior District Judge.

Before the Court is Comptroller of the Currency's Motion To Dismiss Or, In the Alternative, Motion For Summary Judgment, filed May 2, 1997, and pleadings related thereto.

## I. BACKGROUND

On February 4, 1994, Fidelity Bank National Association ("Fidelity") and Interstate National Bank ("Interstate") executed a Plan of Merger and Acquisition ("Plan") and a Merger Agreement. Under the Plan, Fidelity agreed to purchase the assets of Interstate and merge all assets into Fidelity, with Fidelity being the resulting bank. The merger was consummated on July 13, 1995, because only twenty-three shareholders representing 68,183 shares of stock (i.e., less than one third of the outstanding stock) voted (according to the alleged dissenting shareholders ("Dissenters")) either by proxy, or in person before or at a meeting of the shareholders, against the merger between Fidelity and Interstate.[1] Following the July 13, 1995, merger, Dissenters purported to deliver their Interstate common stock certificates to Fidelity on August 1, 1995. On September 11, 1995, Fidelity advised Dissenters that such delivered shares were not endorsed and that Fidelity did not therefore agree that dissenter's rights were perfected.

This lawsuit was originally filed by Fidelity in State District Court which, on October 17, 1995, issued a Temporary Restraining Order by which Dissenters were restrained from exercising their dissenting shareholder rights. Only after removal to Federal Court and this Court's November 3, 1995, refusal to grant a Temporary Restraining Order as requested by Fidelity were Dissenters able to appeal to the Office of the Comptroller of the Currency ("OCC") for an appraisal. Subsequently, Dissenters' counsel William Odeneal ("Odeneal") requested, by letter dated November 6, 1995, that the OCC appraise the dissenters' shares and, in so doing, determine that they had perfected their rights by complying with the provisions set forth in 12 U.S.C. § 215a(b). On December 22, 1995, Fidelity sent a letter to the OCC alleging that Dissenters had failed to perfect their rights for various reasons. On May 6, 1996, the OCC sent to Odeneal a thorough and detailed letter in support of their conclusion that Dissenters had in fact perfected their rights and were therefore entitled to an OCC appraisal.[2] The OCC issued its appraisal on September 23, 1996, showing a value of $20.74/share.

On November 15, 1996, Fidelity filed its First Amended Complaint adding the OCC as a defendant and seeking a declaratory judgment from this Court that Dissenters did not perfect their rights and, alternatively, requesting this Court to set aside the OCC's valuation of the shares at issue in this case. Dissenters filed an amended answer and counterclaim, seeking damages for tort, breach of contract, and securities fraud.

On December 2, 1996, Fidelity tendered to this Court a cashier's check for $1,300,662.88 pursuant to the Court's order granting its motion for interpleader. Fidelity represents this figure to be the amount due to the dissenting shareholders based on the OCC appraisal of $20.74/share from which Fidelity deducts the sum of $1.38 per share which it claims that it has previously paid to Dissenters.[3] Such a claim is erroneous, according to Dissenters, because it is based upon an agreement relating to consideration paid to assenting, not dissenting shareholders.

Thus, Dissenters assert that, pursuant to the relevant provisions of the National Banking Act, 12 U.S.C. § 215(a), et seq., the OCC appraisal is reasonable, is not arbitrary and capricious, is final and binding, and that Fidelity should promptly pay the appraisal price per share in the total sum of $1,393,-375.42 to Dissenters without any deduction for allegedly wrongful prior payments.[4]

---

1. The stock price paid to Interstate shareholders pursuant to the merger agreement was $15.85 per share. AR at 14.

2. The OCC noted an exception with regard to Peggy Chavez. She acquired her shares after the shareholder meeting and those shares had not been voted against the merger by the previous owner. Therefore, the shares were not subject to the OCC's appraisal. AR at 351.

3. Fidelity paid $1.00 per share in dividends and assumed 38 cents per share in taxes. Fidelity alleges that the $1.38 should be subtracted from any amount owed to the alleged dissenters.

4. Dissenters further allege that Plaintiffs wrongfully used Dissenters' money from July 13, 1995 (the date of the merger), until it tendered an alleged "portion" thereof into the Court's Registry pursuant to this Court's November 25, 1996 order.

## II. APPRAISAL

**A. Standard** Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (West 1977), any agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or if the action failed to meet statutory, procedural, or constitutional requirements." *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). When the issue is whether the OCC has acted within the limitations imposed upon it by federal law, the standard of review is de novo. *Ghiglieri v. Sun World, National Association,* 942 F.Supp. 1111, 1114 (W.D.Tex.1996), *rev'd on other grounds,* 117 F.3d 309 (5th Cir.1997). However, the arbitrary and capricious standard applies to factual controversies. *Id.*

**B. Judicial Review of the OCC's Methodology** The standard of review of the OCC's appraisal is arbitrary and capricious. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Title 12 U.S.C. Section 215 contains no guidance for the OCC's appraisal. Thus, the Supreme Court has held that the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The OCC's appraisal was done in accordance with the peer group approach and utilized both the investment value and adjusted book value to reach a final figure.[5] In arriving at the appraised value, the OCC gave a weight of 25% to the adjusted book value and 75% to the investment value. Administrative Record ("AR") at 20. Market value was determined by the OCC not to be readily available and, therefore, was given no weight. AR at 16.

The Court in *Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1553 (10th Cir. 1992), held that it is not for a reviewing court

to tell an administrative agency to delve into new methodology and forge new standards. Thus, the *Boone* Court supported the peer group approach utilized in this case, stating that market value should not be taken into account when the stock is too thinly traded, or where the market for the stock is not dependable.

The OCC correctly contends that the methodology employed was entirely consistent with the methodology set forth in the OCC's Banking Issuance on Stock Appraisals and, further, that the OCC provided Fidelity with a detailed analysis in support of the appraisal. (AR 13–28). This Court finds the OCC's methodology to be reasonable and its supporting explanation to be adequate.

In *Berens v. Ludwig,* 953 F.Supp. 249, 253 (N.D.Ill.1997), the Court upheld the OCC's determination as reasonable, stating that the OCC fully explained the basis of its appraisal, the calculations it used to reach the valuations, and the reasons for using its methodology. The same can be said in this case, as the OCC explained why it used investment value and adjusted book value as the two benchmarks of the stock's value, and why it weighted investment value three times greater than adjusted book value. *See Berens,* 953 F.Supp. at 254 (finding the same methodology to be reasonable).

It should be noted that at least five federal circuits have affirmed the OCC's appraisals, deferring to the OCC's choice of methodology and concluding that in each case it was reasonable. *See Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545 (10th Cir.1992); *Abernathy v. Clarke,* 857 F.2d 237 (4th Cir. 1988); *Keeffe v. Citizens and Northern Bank et al.,* 808 F.2d 246 (3d Cir.1986); *Beerly v. Dep't of Treasury,* 768 F.2d 942 (7th Cir. 1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986); *Lewis v. Clark,* 911 F.2d 1558 (11th Cir.1990). As the 11th Circuit in *Lewis v. Clark,* 911 F.2d 1558, 1563 (11th Cir.1990), stated: "The Comptroller's appraisal is reviewed under a deferential standard ... We do not assess whether the

5. The "peer group approach" develops earnings and book multiples based on a group of financial institutions that operate in the same state as the subject institution and whose stock trades actively on an exchange or over the counter. *See* Dissenters Exhibit B to Dissenters Reply To Plaintiff's Response to Dissenters' Rule 12(c) and 12(f) Motions.

appraisal was correct or utilized the best methods. We determine only whether it was reasonable."

In *Beerly v. Dept. of the Treasury*, 768 F.2d 942, 945 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986), the OCC considered four measures of a stock's value: book value, adjusted book value, market value, and investment value. As in this case, the OCC gave no weight to book value or market value, but instead used adjusted book value and investment value to arrive at the appraised value of the stock. *Id.* The plaintiff argued that the method resulted in a price that was too low. *Id.* at 944. While the Seventh Circuit noted that the method used by the OCC had been frequently criticized, it found that this was not a reason to reject the methodology, stating that "... the fact that the Comptroller was following a conventional approach goes far to shield his results from judicial invalidation. It is not for a reviewing court to tell an administrative agency to defy conventional wisdom, to innovate, to be daring." *Id.* at 945–46. Accordingly, this Court does not decide today that the OCC's methodology in this case was the most appropriate, but rather holds that the Comptroller exercised his discretion reasonably.

■ **C. Minority Discount** Fidelity alleges that the OCC was arbitrary and capricious under 12 U.S.C. § 215(a), which requires the OCC to determine the fair value of the *dissenters'* stock. Specifically, Fidelity contends that the OCC should have applied a minority discount to its appraisal value.

On March 10, 1992, the OCC published its Banking Issuance on Stock Appraisals which summarized the methods of evaluation used by the OCC in determining the value of shares. The OCC does not directly discount minority shares because once shareholders dissent, they are no longer to be considered minority shareholders as their interest in the bank has been changed over their objection. AR at 15–20, 293–94. The OCC contends that the "fair value" of the shares should exclude any appreciation or depreciation that may have occurred in anticipation of the

corporate action. It is for this reason that the OCC considers neither discounts or premiums when appraising stock. AR at 15, 19. The OCC argues that it is reasonable (i.e. not arbitrary and capricious) not to apply a minority discount because to do so would put dissenting shareholders at an inequitable disadvantage. AR at 17–18. The Court finds that the OCC's support (as set forth in its May 6, 1996, appraisal) for not applying a minority discount was not arbitrary and capricious.

■ **D. Market Value** Fidelity also contends that the OCC was arbitrary and capricious in failing to account for market value in its appraisal. Fidelity's stock was not listed on a major exchange, nor was there a price quoted by an active market maker or stock brokerage firm. AR at 16. According to the OCC appraisal, there were limited trades in 1991 and 1992, 12 trades in 1993, and two trades between January 1, 1994, and July 13, 1995. AR at 16. Generally, the OCC looks for data going back only 18 months when appraising stock. In the two years before the appraisal, less than 1% of the shares changed hands. OCC's Motion To Dismiss, filed May 2, 1997, at 19; OCC's Reply, filed June 23, 1997, at 6. Fidelity alleges that between 1992 and 1995, there were three arm's length transactions in which over 86% of the shareholders valued their stock between $10.00 and $14.47 per share. Fidelity's Response, filed March 19, 1997, at 19. The OCC, however, maintains that the majority of these transactions were made for the purpose of gaining control of the bank and should therefore not be utilized in the appraisal.[6] For instance, one transaction at issue was the bank's offer of $15.85 that was rejected by the dissenting shareholders. Another point of controversy involved a transaction with Gary and Janet Acker. In December, 1992, the Ackers entered into a stock purchase contract for the purpose of controlling Interstate. Fidelity's subsequent purchase of the contract from the Ackers was not a stock transaction, but merely the sale of the right to purchase the controlling interest. The Court agrees with the OCC that

---

**6.** The OCC disregards trades that are for the purpose of gaining control of the bank as they do not represent the true value of the stock. AR at 16.

this was done pursuant to a settlement agreement and is not telling of the value of the stock. *See* AR at 295. The Court finds that the OCC's exclusion of market value was not arbitrary and capricious. *See Beerly v. Dept. of the Treasury*, 768 F.2d 942, 945 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986) (upholding the OCC's exclusion of market value in its appraisal); *see also, Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1553 (10th Cir.1992) (holding the OCC's determination to be reasonable despite the fact that the OCC assigned no weight to the market value of the stock on the grounds that the stock was thinly traded during the three years preceding the merger and because most of the trades took place between insiders and/or control groups).

**E. The Peer Group** The OCC made the appraisal, in part, by employing the peer bank comparison method. Fidelity contends that this method was arbitrary and capricious because the OCC primarily used figures from holding companies with much higher asset bases than Interstate.

■ Fidelity argues that the peer bank comparison method was unreasonable because, for instance, the median total assets for the banking organizations in the peer group were valued at over $460 million, while Interstate's assets were valued at only $38 million. Some have been critical of this method, stating that the real problem is that the OCC does not value the target bank, but assumes that the target bank has comparable peer group banks with which it can be compared. D. Austin & S. Bires, *Dissenters' Appraisals*, 111 Banking L.J. 393, 406 (1994). However, the OCC alleges that the holding banks and the one national bank used as peers were all located in Texas, all were actively traded on an exchange or over-the-counter, and all had liability and earnings mixes similar to Interstate. AR at 16–18, 23–28. Selection of a peer group is a discretionary act because the term is not statutorily defined and it involves familiarity with factors particularly within the Comptroller's expertise. *Boone v. Carlsbad Bancorporation*, 972 F.2d 1545, 1554 (10th Cir.1992). Thus, the Court finds that the OCC's utiliza-

tion of the peer group methodology was reasonable.

## III. PERFECTION OF DISSENTING SHAREHOLDERS' RIGHTS

■ **A. Judicial Review of the OCC's Determination** Fidelity argues that the OCC did not have the authority to determine whether the dissenting shareholders had perfected their rights and that such a determination is within the province of the judiciary. Fidelity supports this assertion by arguing that where an agency is not charged with *administering* a particular statute, the agency's interpretation should not be accorded deference. *See Linemaster Switch Corp. v. US. E.P.A.*, 938 F.2d 1299, 1303 (D.C.Cir. 1991) (holding that before the court may defer to an agency's construction of a statute, it must find either explicit or implicit evidence of congressional intent to delegate interpretative authority). However, it is both logical and practical to let the OCC interpret whether the parties before it have perfected their dissenter's rights, for each time the OCC makes an appraisal, it necessarily decides that it is dealing with true dissenters.

Further, the statute in question, 12 U.S.C. § 215(a), distinctly addresses "dissenting shareholders" and thus it is implicit in the statute that the OCC has the authority to determine whether the Dissenters are dissenters subject to the OCC appraisal process. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (holding that an agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation); *see also, Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961) (holding, " . . . we see no reason why we should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision."). It is true that while administrative agencies are expert in technical problems within their jurisdiction, they enjoy no special skill in statutory construction, an area in which the courts are the final authority. *Western Coal Traffic League*

v. U.S., 694 F.2d 378, 383–84 (5th Cir.1982), on reh'g, 719 F.2d 772 (5th Cir.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984). However, this case involves the OCC making a determination of shareholder status based upon a factual record well within its of expertise and regulatory authority.

The Fifth Circuit in *Martin v. Kilgore First Bancorp, Inc.*, 747 F.2d 1024, 1027 (5th Cir.1984), ruled "... our duty is to interpret the words of the statute to further the purpose Congress sought to accomplish by its enactment. Because the Comptroller has the primary responsibility for regulating consolidations involving national banks, we will accord substantial deference to his interpretation ... where it represents a reasonable construction of the language and is consistent with the legislative intent."

In addition, the Supreme Court has held that the OCC is charged with the enforcement of banking laws and therefore that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with enforcement of that statute. *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 403, 404, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Further, in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court held that in the case of either an explicit or implicit delegation of administering authority by Congress to an agency, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency. Along the same lines, in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), the Court stated that if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute—if the administrator's reading is reasonable in light of the legislature's revealed design, the administrator's judgment is to be given controlling weight. This Court finds the Commissioner's determination to be reasonable.

**B. The OCC's Determination of Dissenters' Perfection of Dissenting Rights** Fidelity contends that the OCC was arbitrary and capricious in its determination that certain Interstate shareholders had perfected their dissenting rights. Each of Fidelity's contentions will be addressed separately and in light of the governing law, including 12 U.S.C. § 215a(b), which states:

> [A]ny shareholder of any association to be merged into the receiving association who has voted against such merger at the meeting ... or has given notice in writing at or prior to such meeting ... that he dissents from the plan of merger, shall be entitled to receive the value of the shares so held by him when such merger shall be approved by the Comptroller upon written request made to the receiving association at any time before thirty days after the date of consummation of the merger, accompanied by the surrender of his stock certificates.

■ Fidelity contends that the OCC considered improper evidence in reaching its conclusion. An agency ruling would be arbitrary and capricious if the agency relied on factors which Congress intended it not to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Veh. Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 37, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The reviewing court should not attempt itself to make up for such deficiencies and thus may not supply a reasoned basis for the agency's action that the agency itself has not given. *Id.*

Fidelity argues that there was, for instance, in consideration before the OCC a false letter enclosing a newspaper article and indicating that Fidelity was using the "dissenters'" money to fund a second merger. However, Fidelity fails to demonstrate that the OCC relied on these documents. *See* Fidelity's Response, filed March 19, 1997, at 5–6. The Court finds that the record does not reflect that the documents were improperly relied upon.

When modern corporate statutes began to permit certain mergers to occur with less than unanimous shareholder consent, "... it was realized that it was necessary to afford some relief to dissenters (and) the purpose of these statutes is to protect the property rights of dissenting shareholders from actions by majority shareholders which alter the character of their investment." FLETCHER ON CORPORATIONS, § 5906.10 (Perm.Ed.1996); *see also,* MODEL BUS.CORP.ACT §§ 80, 81 (1979). Therefore, a number of courts have applied a liberal interpretation to the procedural requirements of dissenters' rights statutes in order to effect the statutory purpose of providing the bank with notice of possible dissident shareholders and of paying dissenters the fair value of their investment. FLETCHER CYCLOPEDIA CORPORATIONS, § 5906.70 (Perm. Ed.1996); *see also, Raab v. Villager Industries, Inc.,* 355 A.2d 888, 891 (Del.1976); *Zeeb v. Atlas Powder Co.,* 87 A.2d 123, 127 (Del. 1952). Further, the Fifth Circuit has ruled in favor of a liberal statutory construction when such is necessary to effectuate the intent and purpose of the statute. *See Saulsbury v. Wismer and Becker, Inc.,* 644 F.2d 1251, 1255 (9th Cir.1980). In sum, the Court finds that Fidelity's contentions as to the failure of Dissenters to protect their rights of dissent generally lack merit, for Fidelity was, in each situation presented to this Court, on notice of the intent of the dissenting shareholder(s).

**■ 1. The "Surrender" Requirement of 12 U.S.C. § 215a(b)** Fidelity claims that Dissenters, except for Mr. Ware, failed to "surrender" their stock certificates in accordance with 12 U.S.C. § 215a(b) because the certificates were not endorsed when delivered to Fidelity. There appear to be no statutes or regulations which define the word "surrender" for purposes of 12 U.S.C. § 215a(b). The OCC correctly argues that requiring signatures results in no gain to the bank. Further, under the Texas Business and Commerce Code, mere delivery of an investment security is effective against the transferor.

*See* TEX.BUS.COM.CODE § 8.307 (Vernon's 1991).[7] Thus, the Court finds that it was reasonable for the OCC to determine that the stock certificates were surrendered upon delivery despite the lack of endorsement.

**2. Kirks and Featherstons**

**■ a)** The proxy for the 500 shares owned by Greg and Renee Kirk was signed only by Greg Kirk and the proxy for the 500 shares owned by Troy and Mollie Featherston was signed only by Troy Featherston. However, the purpose of the statute (i.e., providing notice of dissident shareholders) was served despite the lack of both spouses' signatures. In *Raab v. Villager Industries, Inc.,* 355 A.2d 888, 891–892 (Del.1976), the Court held that the purpose of Delaware's dissenters' rights statute was merely to give notice. Further, the Court ruled that the requirements of the statute are to be liberally construed for the protection of objecting stockholders. *Id.* As a result, the Court found no reasonable basis, in light of the limited notice purpose of the statute, for a requirement that an objection be signed by both husband and wife as joint stockholders. *Id.* Similarly and by analogy, Fidelity's objection to the lack of both spouses' signatures in the case of the Featherstons and Kirks is unwarranted as there was pre-vote notice to the corporation that the shares thus held probably would be voted against the merger. Thus, the Court finds that, in light of the purpose of 12 U.S.C. § 215a, a proxy signed by only one joint shareholder does provide effective notice of the joint shareholders' consent.

b) On August 1, 1995, Odeneal sent a letter to Fidelity on behalf of Dissenters, requesting the cash value of their stock, accompanied by their stock certificates. Fidelity alleges that the Kirks and Featherstons made oral representations to them that Odeneal did not represent them on August 1, 1995, and therefore they did not give the notice required under 12 U.S.C. § 215a and did not perfect their dissenter's rights. These claims are controverted by the affidavits of

---

**7.** In addition, the Uniform Commercial Code reflects the common law rule that mere delivery of the stock certificate, with intent to transfer the shares represented thereby, is a sufficient transfer as between the parties, without any endorsement or written assignment. FLETCHER CYCLOPEDIA CORPORATIONS § 5482.50 (Perm. Ed.1996).

the Featherstons and Kirks. Exhibit B to Dissenters' First Amended Answer, filed April 18, 1997. Further, Odeneal, by sending the certificates in question, put Fidelity on notice that the Featherstons and Kirks were dissenting shareholders. *See* AR at 5–6.

3. **John Bane** Fidelity argues that John Bane purchased 500 of his shares *after* the shareholder meeting at which the merger was voted upon. However, the shares acquired by John Bane had originally been voted against the merger. Consequently, Fidelity had effectively been put on timely notice that these shares would be dissenting shares.

4. **Newsom and Carter, Inc.** Fidelity argues that a ballot for the 5,000 shares owned by Newsom and Carter, Inc. was not properly voted by the signing individual because it was not accompanied by any incumbency certificate specifying the corporate officers or by board resolutions indicating corporate authority for any such officer to sign the ballot on behalf of the corporation at the shareholder meeting. The Court finds that there was effective notice by the corporation even though not accompanied by proof of authority to vote.

5. **Phillips as Trustee, Tillery, and Ware** Fidelity contends that the proxies for shares owned by Phillips as Trustee, Tillery, and Ware were not properly revoked and therefore these individuals could not actually vote against the merger at the meeting. There were three alternative proxy revocation procedures set out in the proxy materials: 1) a subsequently dated proxy; 2) written notice addressed to the Chairman of the Board; and 3) written notice given in person to the Chairman of the Special Meeting at the Meeting. However, the shareholders at the meeting were asked to complete a "sign in" sheet, which inquired whether the shareholder had previously submitted a proxy, and whether the shareholder was going to "vote in person" at the meeting. AR at 13–14. Shareholders who were going to vote in person were given a ballot with their earlier proxy stapled to it and thus were led to believe that they were properly revoking their proxies. *Id.* The Court finds that Fidelity was on adequate notice that the shares owned by Phillips, as Trustee, Tillery, and Ware, were voted against the merger.

6. **Middleton** Fidelity alleges that the 500 shares owned by Lowell Middleton were not surrendered within 30 days of the date of consummation of the merger in accordance with 12 U.S.C. §§ 215a(b). When Odeneal sent a letter to Fidelity on behalf of the dissenting shareholders to request the cash value of their stock, Middleton was on vacation and, as a result, his certificate was not included. Middleton did not have notice of the consummation of the merger until July 21, 1995. A.R. at 37. His certificate was tendered to Fidelity on August 18, 1995. Because, the OCC has historically started the 30 day time period from the date of notice, rather than the date of consummation, the Court finds that the OCC's acceptance of his certificate was reasonable. *Id.*

7. **Tinsley** Fidelity claims that the shares held in the name of Catherine Pitman were voted by Ms. Catherine Tinsley, despite the fact the Interstate's records do not reflect a change in the name of the stock certificate. The OCC contends that Ms. "Tinsley" was given a ballot at the meeting and that this shows that the Bank believed that she had a right to vote. AR at 41. Regardless of the veracity of this assertion, Fidelity was on notice that these shares had been voted against the merger at the shareholders' meeting.

## IV. CONCLUSION

After considering the pleadings and the evidence presented by Defendants, the Court is of the opinion that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. Therefore, Defendants' Motion For Summary Judgment is **GRANTED**. Plaintiff's claims are dismissed with prejudice and Plaintiff shall take nothing by its suit against Defendants. Counsel for all parties are **DIRECTED** to confer and file with this Court before noon, January 12, 1998, a joint report setting forth the remaining claims and pending motions in this case,

with recommendations for disposition of the litigation.

SO ORDERED.