**Patrick M. McQUEEN, Plaintiff–Appellant,**

**v.**

**Julie L. WILLIAMS, Defendant–Appellee.**

No. 97–2005.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 22, 1998.

Decided May 19, 1999.

E. John Blanchard, Asst. Attorney General (argued and briefed), Michigan Department of Attorney General, Insurance & Banking Division, Lansing, MI, for Plaintiff–Appellant.

Horace G. Sneed (argued and briefed), Office of Comptroller of Currency, Washington, DC, for Defendant–Appellee.

Before: WELLFORD, NORRIS, and BATCHELDER, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

KeyCorp is a bank holding company located in Cleveland, Ohio. In an effort to implement a master plan of combining affiliate banks in Michigan, Indiana, and Ohio, KeyCorp filed three applications with the Office of the Comptroller of the Currency ("OCC") on the same day. The first application sought to convert one of its affiliate banks, Society Bank of Michigan, to a national bank and to designate a branch in Bronson, Michigan, as that bank's "main office." That application also sought to allow the bank to retain the existing branches after the conversion. The second application sought permission to relocate the Bronson "main office" to Angola, Indiana, while at the same time retaining the existing Michigan branches. Finally, in the third application, the bank sought permission to merge with an Indiana national bank, resulting in a national bank based in Angola, while retaining the Indiana and Michigan branches. KeyCorp sought also to establish and to retain all of the former "main offices" as branches. In what the state of Michigan asserts is an unprecedented decision issued on January 5, 1996, the OCC approved the applications. The Commissioner of the Michigan Financial Institutions Bureau ("Commissioner") objected to the OCC's decision, and filed the instant case to have it set aside. The district court below affirmed the decision of the OCC

and granted summary judgment in its favor. For the reasons stated, we shall **REVERSE** the district court's grant of summary judgment in favor of the OCC.

## I. BACKGROUND

The following factual background is largely undisputed. KeyCorp wished to create a major regional banking network and to engage in interstate banking in the Michigan–Indiana–Ohio tristate area. To that end, KeyCorp planned to combine its affiliate banks in those states and to retain all of their over 420 branches through a three-step procedure.[1]

KeyCorp's plan may have been permissible pursuant to the Riegle–Neal Interstate Banking and Branching Efficiency Act of 1994, Pub.L. No. 103–328; 108 Stat. 2338 ("Riegle–Neal" or "the Act"), which establishes a framework for interstate branching. That Act, however, did not go into effect until June 1, 1997, but each individual state had the opportunity to "opt-in" to the Act prior to that date. Michigan had enacted "opt-in" legislation at the pertinent time to allow interstate banking, but neither Indiana nor Ohio had done so. Furthermore, Michigan's opt-in legislation required reciprocity, so that only an out-of-state bank located in a state whose laws also permit the establishment in that state of a Michigan branch bank was able to establish and operate a branch bank in

Michigan. In light of these perceived obstacles, KeyCorp devised a plan to accomplish its goals of interstate banking through a circuitous legal route.

On October 29, 1995, KeyCorp filed its first application to the OCC ("the Conversion Application") seeking to convert one of KeyCorp's affiliate state-chartered banks, Society Bank, Michigan ("Society–Michigan"), which had its principal office in Ann Arbor, Michigan,[2] into a national bank. The converted national bank, which was to be called Society Bank, National Association ("Society–N.A."), sought to designate its "main office" at a small branch office in Bronson, Michigan.[3] The Conversion Application also sought OCC approval for the converted bank to retain Society–Michigan's existing branches under 12 U.S.C. § 36(b)(1), and to establish the large Ann Arbor office as a regular branch.[4] Bronson is considerably more than thirty miles from Ann Arbor.

On the same date, KeyCorp made a second application ("the Relocation Application") to the OCC for approval, after the conversion, for Society–N.A. to relocate its "main office" from Bronson, Michigan, to Angola, Indiana, pursuant to 12 U.S.C. § 30. Angola is approximately twenty miles from the city limits of Bronson and, in 1990, had a population of approximately 8,100. The Relocation Application also requested that, after the relocation, that So-

---

1. A Society Bank news release dated October 26 from Ann Arbor, Michigan, stated:
KEYCORP READIES FOR INTERSTATE BRANCHING
Society Banks in Ohio, Indiana and Michigan Set to Unite in 1996
Regional Affiliation and Name Change Elevate National KeyBank Identity
   The establishment of the regional bank, which requires regulatory approval, begins in February and is anticipated to be completed by midyear 1996. Initially, Society Bank, Michigan will convert to a national bank, and relocate its main office to Indiana, where it is scheduled to merge with Society National Bank, Indiana, in February 1996, creating KeyBank. Then KeyBank will relocate its main office to Ohio, and is scheduled to merge with Soci-

ety National Bank in mid–1996. The bank will retain the KeyBank name and will share headquarter sites with its parent company, KeyCorp, in Cleveland, Ohio.

2. Ann Arbor had a 1990 population of over 100,000 and is the location of the well-recognized University of Michigan and its thousands of students.

3. In 1990, Bronson had a population of approximately 2,300.

4. In the Conversion Application, Society–Michigan also requested OCC approval to exercise fiduciary powers pursuant to 12 U.S.C. § 92a, but that request is not the subject of dispute in this appeal.

ciety-N.A. be able to retain all of its existing branches in Michigan and establish a branch at its former "main office" location in Bronson pursuant to 12 U.S.C. § 36(c).

Finally, on the same date, KeyCorp made a third application ("the Merger Application") to the OCC for approval to merge Society National Bank, Indiana ("Society-N.A., Indiana"), having its "main office" in South Bend, Indiana, more than thirty miles from Angola, with and into Society N.A., Michigan, pursuant to 12 U.S.C. §§ 215a & 1828(c). The application requested that the merged institution be able to retain the branches of both merging banks in Michigan and Indiana, and for the Indiana "main office" in South Bend to be established as a branch after the merger.

In sum, KeyCorp's applications sought to accomplish the following:

### 1. Conversion Application

(a) Convert Society-Michigan into a National Bank called Society-N.A.;

(b) Designate a branch in Bronson, Michigan, as Society-N.A.'s "main office;"

(c) Retain all of the existing Michigan branches after the conversion; and

(d) Establish the location in Ann Arbor (formerly the "principal office") as a branch.

### 2. Relocation Application

(a) Relocate Society-N.A.'s "main office" to Angola, Indiana;

(b) Retain all existing Michigan branches after the relocation;

(c) Establish the location in Bronson (the "main office" designated in the Conversion Application) as a branch.

### 3. Merger Application

(a) Merge Society-N.A., Indiana, with Society-N.A., Michigan;

(b) Retain all existing Michigan and Indiana branches after the merger; and

(c) Establish the location in South Bend, formerly the "main office" of Society-N.A., Indiana, as a branch.

KeyCorp's master plan also involved a subsequent relocation of the Angola, Indiana, "main office" from Angola, Indiana, to Bryan, Ohio, about 25 miles away.[5] Through that relocation and other mergers, KeyCorp sought to own and operate a three-state midwestern regional bank with its headquarters in Cleveland, Ohio, and over 420 branches. For purposes of this appeal, we consider only the three applications outlined above.

On October 31, 1995, the Assistant Vice-President and General Counsel of Society-Michigan sent a letter to the Commissioner of the Michigan Financial Institutions Bureau, Patrick McQueen ("Commissioner"), which basically outlined the company's intentions that had been discussed at an earlier meeting between Commissioner McQueen and representatives of Society-Michigan.[6] The letter indicated that Society-Michigan believed that the mergers could not take place before June 1, 1997, unless Indiana and Ohio enacted qualifying "opt-in" legislation. On November 15, 1995, however, a Deputy Comptroller telephoned the Commissioner's Chief Deputy and informed him that the OCC was of the view that Society-Michigan's "main office" could be established at any location at the time of conversion, just as in the case of a *de novo* charter. Thus, under the OCC's view as espoused by the Deputy Comptroller, the mergers could be accomplished under the existing federal law despite the serious problem recognized only a few

---

**5.** The entire master plan has been set forth graphically at page 7 of the Appellant's Brief.

**6.** The Commissioner claims that the plan outlined in the letter is different from what the parties had discussed at the prior meeting, and that the Commissioner felt that KeyCorp misled him into believing that KeyCorp would charter a bank *de novo*, not convert the existing bank.

days before by Society–Michigan's general counsel.

On November 22, 1995, the Commissioner submitted a formal written protest to the OCC to object to the bank's plan. Concurrently with his protest, the Commissioner issued a "cease and desist" order against the bank to prevent it from pursuing the plan in Michigan. That Michigan administrative proceeding is presently stayed pending this appeal.

On January 5, 1996, the OCC issued a 38–page decision approving all three of the applications filed by KeyCorp/Society Bank. On February 27, 1996, the Commissioner filed his complaint in the district court seeking judicial review of the OCC's decision, asking that the court set it aside as having been arbitrary and capricious, an abuse of discretion, and not in accordance with the law. The complaint also sought a declaration that the OCC's simultaneous approval of the three applications: (1) violated state law; (2) violated federal law; (3) resulted in competitive inequality between state chartered banks and national banks; (4) subverted the long-standing competitive equality concept; and (5) circumvented the Riegle–Neal Act and the McFadden Act. Pub.L. No. 103–328; 108 Stat. 2338 (the "Riegle–Neal Act"); 12 U.S.C. § 36(c) (the "McFadden Act").

The parties filed cross-motions for summary judgment, and the district court granted summary judgment in favor of the OCC in all respects. First, the court found that the OCC's decision to allow Society–Michigan to designate Bronson as the location of its "main office," rather than choosing the original "principal office" located in Ann Arbor in the state charter, constituted a reasonable interpretation of the applicable statutes. Next, the court upheld the OCC's decision to allow what would then be called Society–N.A. to relocate its "main office" to Angola, Indiana, and to retain its Michigan branches after the relocation, in accordance with *Ghiglieri v. Sun World Nat'l Ass'n*, 117 F.3d 309 (5th Cir.1997). The district court

further upheld both the OCC's decision to permit Society–N.A. to establish a branch at the former "main office" Bronson location, and its conclusion that because it was approving the first two applications, there was no obstacle to approving the merger involved in the third application.

## II. *STANDARD OF REVIEW*

The standard of review for the district court's legal conclusions in the grant of summary judgment is *de novo*. *Sun World*, 117 F.3d at 313; *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). The Fifth Circuit has explained the appropriate analysis in a similar case in which the Commissioner challenged the OCC's decision pursuant to the Administrative Procedures Act. We "review the decision of the Comptroller *de novo* to determine whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sun World*, 117 F.3d at 313 (quoting 5 U.S.C. § 706(2)(A)); *see also Warren Bank v. Camp*, 396 F.2d 52, 54 (6th Cir. 1968) (setting out the standard of review under the Administrative Procedures Act). The *Sun World* court quoted the Supreme Court's statement on review of an agency's interpretation of a statute:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Sun World,* 117 F.3d at 313 (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The issues we discuss in this appeal are essentially legal questions which we review *de novo,* giving deference to the OCC when appropriate. *See Seattle Trust & Savings Bank v. Bank of California,* 492 F.2d 48, 50 (9th Cir.1974) (reviewing *de novo* the OCC's approval of a national bank's establishment of an additional branch in Seattle and determining that "the principal issue was whether the Comptroller has acted within the limitations imposed upon him by federal and state law, not whether he has acted reasonably or unreasonably").

### III. *ANALYSIS*

In this complex case, the parties have raised many issues for our review. We find it necessary, however, to discuss only two issues, either of which is dispositive of the entire case.

**A. *Allowing Society–Michigan to Designate Bronson, Michigan, as the "Main Office" of the Converted Bank***

State banks may convert into national banks pursuant to 12 U.S.C. § 35, which provides in part:

> Any bank incorporated by special law of any State or of the United States or organized under the general laws of any State or of the United States and having an unimpaired capital sufficient to entitle it to become a national banking association under the provisions of the existing laws may, by the vote of the shareholders owning not less than fifty-one per centum of the capital stock of such bank or banking association, with the approval of the Comptroller of the Currency be converted into a national banking association, with a name that contains the word "national": *Provided, however,* That said conversion shall not be in contravention of the State law.

(Emphasis in original). Pursuant to MICH. COMP. LAWS § 487.431, a bank organized under Michigan law may convert into a national bank, provided that the converting bank receives the approval of two-thirds of its shareholders. Here, Society–Michigan was wholly owned by Society Bancorp, Inc., which approved the conversion. Therefore, the conversion in this case was consistent with Michigan's conversion laws.

The Commissioner concedes that the conversion in this case was not in violation of the general provisions of § 35. Rather, the Commissioner claims that the OCC erred in approving the first step in Society–Michigan's conversion—designating the small branch in Bronson as its "main office." We now turn to the OCC's reasoning in approving this "designation."

The OCC determined that it was permissible for Society–Michigan to designate the branch in Bronson, Michigan, as the converted bank's "main office," even though the state bank's "principal office"— as it is sometimes called under Michigan law—was a large facility in Ann Arbor, Michigan. Treating the conversion as a *de novo* charter, the OCC held that a "converting bank has the same right as the organizers of a new national bank to designate in its organization certificate any location for its main office." [7] Thus, according to the OCC, Society Bank may designate as its "main office" a place other than the state-approved "principal office" location. To support that conclusion, the OCC pointed out that (1) existing statutes and regulations do not require that a converting bank designate the state-approved "principal office" as the converted bank's "main office;" and (2) Congress, the OCC, and the courts generally treat a charter conversion and the *de novo* formation of a new national bank alike.

The OCC found that "[n]othing in the National Bank Act ... requires the converting state bank to designate as the

---

7. The OCC later altered this position to allow the bank to designate as its "main office" any place where the bank has or could have a branch.

converted national bank's main office location the same site that served as the state bank's main office location.... Moreover, § 35 does not prohibit the converting bank from designating a main office location that is different from its state-approved main office location." Furthermore, the OCC found that the applicable regulations did not require a different result.

Finding no guidance in explicit statutory authority, the OCC referred to the manner in which charter conversions had been treated by Congress, the OCC, and the courts. It determined that the legislative history of § 35 evidenced Congress' intention to treat the organization of a new national bank and the conversion of a state bank as, in effect, the same type of transaction. Because a newly-chartered national bank would be able to designate its "main office" at any location, it follows, then, that a converting bank could do the same.

In addition, the OCC found that its own publications support the same conclusion. For example, one publication notes that after the articles of association or organization certificate are completed, "the proceedings for the conversion of a State Bank into a National association are the same as those for the organization of a new bank."[8] Also, the OCC states that in its Annual Report it has traditionally reported charter conversions as a subset of the total of newly issued national bank charters.

Furthermore, the OCC claims that court decisions recognize the similarities between the statutory procedures for the conversion of a state bank into a national bank and the formation of a new national bank. *See Casey v. Galli,* 94 U.S. 673, 678–79, 24 L.Ed. 168 (1877) (comparing the statutory provisions under the National Bank Act for the formation of a new bank and the conversion of a state bank). Also, the OCC found that decisions support the idea of a "fresh start" with respect to a

converting bank's relationship to the OCC. *See Traverse City State Bank v. Empire Nat'l Bank,* 228 F.Supp. 984, 989 (W.D.Mich.1964); *McMurray v. Security Bank of Lynnwood,* 64 Wash.2d 708, 393 P.2d 960, 963 (1964).

Finally, the OCC claims that its rules, policies, and procedures for the corporate activity of national banks treat the organization of new banks and the conversion of state banks in a similar manner. For example, the valuative factors considered in deciding whether to approve or disapprove a new charter application or a conversion application are the same. With respect to the organization of a new bank, the OCC policy is to charter banks that "will have a reasonable likelihood of success and will be operated in a safe and sound manner." 12 C.F.R. § 5.20(d). Similarly, the OCC's policy toward a charter conversion focuses on whether the conversion is consistent with maintaining a sound banking system. 12 C.F.R. § 5.24(c)(1). Under both circumstances, the OCC evaluates, among other things, the new or converted bank's adequacy of capital, earnings prospects or past performance, and anticipated community service or its past record of such service. Because of these and other similarities between the OCC's consideration of a newly chartered bank and a converting state bank, the OCC found that Society–Michigan should have the same right as a new bank to designate a "main office" at any location where it maintains or could maintain an office branch.

The district court affirmed the decision of the OCC, finding that its conclusion was reasonable. Like the OCC, the court found that the Banking Act did not address specifically whether a converting bank may designate its "main office" in a location different from that of the state bank's "principal office." In giving deference to the agency, the court found that

8. Instructions and Suggestions of the Comptroller of the Currency in Regard to the Organization and Management of National Banks at 1–6.

the OCC's decision was a reasonable interpretation of the statute.

On appeal, the Commissioner acknowledges that no statute or regulation specifically requires a converting state bank to continue to use its "principal office" as the "main office" for the newly formed national bank. He contends, however, that the "designation" of Bronson should be treated as a "relocation" rather than a *de novo* designation. Under 12 U.S.C. § 30(b), any relocation of a national bank's "main office" must be to a location within thirty miles of the original one.[9] Because the distance between Ann Arbor and Bronson is well in excess of 30 miles, the "relocation" violates the so-called "30–mile rule" in § 30(b). Alternatively, the Commissioner argues that if Michigan law applies to this issue, then the OCC's approval of the "relocation" violates MICH. COMP. LAWS § 487.457, because Society–Michigan did not obtain the Commissioner's prior approval as is required under that statute.[10] Thus, under either federal or state law, the Commissioner's position hinges on its claim that the designation of Bronson was actually a "relocation" from Ann Arbor, not an original "designation."

The Commissioner also contends that the OCC should have considered the substance of the conversion scheme as a whole and the *bona fides* of the situation. The small Bronson branch was designated solely because it was within thirty miles of the next intended "main office" location in Angola, Indiana.[11] Indeed, the second application, filed contemporaneously with the Conversion Application, sought to relocate the newly designated Bronson "main office" across state lines to Angola, Indiana. The Commissioner argues that in choosing Bronson, the manifest intent of the bank was to usurp the laws of the states that had not elected to "opt-in" to the provisions of the Riegle–Neal Act. In light of these circumstances, the Commissioner argues, the fictional designation of Bronson as the "main office" should not be permitted.

We must determine whether Society–Michigan/Society–N.A.'s choice of the Bronson branch as its new "main office" should be allowed as a new charter "designation" or whether it should be treated as "relocation," as is argued by the Commissioner. As indicated above, "we review the decision of the OCC *de novo* to determine whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sun World*, 117 F.3d at 313 (quoting 5 U.S.C. § 706(2)(A)). We agree that the statutes are silent on this issue. Thus, because "Congress has not directly addressed the precise question at issue, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute."

9. Section 30(b) provides:

Any national banking association, upon written notice to the Comptroller of the Currency, may change the location of its main office to any authorized branch location within the limits of the city, town, or village in which it is situated, or, with a vote of shareholders owning two-thirds of the stock of such association for a relocation outside such limits and upon receipt of a certificate of approval form the Comptroller of the Currency, to any other location within or outside the limits of the city, town, or village in which it is located, *but not more than thirty miles beyond such limits.*

(Emphasis added).

10. Michigan law provides:

Upon written notice to the commissioner, a bank may change the location of its main office to any existing branch location of the bank within the limits of the city, village, or township in which the bank is located. *With the prior written approval of the commissioner,* a bank may change the location of its principal office to any other location within this state.

MICH. COMP. LAWS § 487.457 (emphasis added).

11. The OCC stated in its main brief:

The conversion, though, was only the first step of a multi-step consolidation. It was followed by relocation of the bank's main office to Angola, Indiana, and a merger with an Indiana national bank owned by KeyCorp.

OCCs Brief at 7.

*Id.* (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

We note at the outset that this particular issue has never before been addressed by a court. In cases involving related issues, courts have dealt with the propriety of § 30 relocations within the thirty-mile restriction. *See, e.g., Ramapo Bank v. Camp,* 425 F.2d 333, 336 (3d Cir.1970) (national bank sought to relocate its "main office" to a branch 2.7 miles away); *Marion Nat'l Bank v. Van Buren Bank,* 418 F.2d 121, 122 (7th Cir.1970) (converting state bank desired to move its head office from state "principal office" location to a branch 12 miles away); *Traverse City,* 228 F.Supp. at 988 (reviewing application to relocate "main office" within thirty miles); *see also Bank of Western Oklahoma v. First Nat'l Bank of Sayre,* No. CIV–95–1930–A, 1996 U.S. Dist. LEXIS 11909, at *6 (W.D.Okla. July 29, 1996) (dealing with a "main office" relocation of a national bank within thirty miles). We have found no cases discussing the propriety of a converting bank's *ab initio* designation of an arbitrary "main office," such as the small branch in Bronson, upon its conversion from a state to a national bank.

This court has previously held that the substance of a bank's application will govern over the form of that application. *Bank of Dearborn v. Saxon,* 244 F.Supp. 394 (E.D.Mich.1965), *aff'd,* 377 F.2d 496 (6th Cir.1967). In *Dearborn,* the state-chartered Manufacturers Bank desired to establish a branch bank in Dearborn, Michigan, near a new shopping center where there was a great potential for business. The bank's problem was that, in its own words, "[e]xisting antiquated state banking regulations w[ould] not permit [the bank] to open another branch in the City of Dearborn" because it already had four branches within the city. *Dearborn,* 244 F.Supp. at 396. For this reason, the bank developed a plan whereby it would establish a "new" branch just outside the city limits in the town of Dartmouth, just a block and a half from an already existing branch in Dearborn called the Telegraph–Carlysle branch. Because the customers of the Telegraph–Carlysle branch would easily be served by the "new" Dartmouth branch, the Telegraph–Carlysle branch would be free to "move" to a location near the new shopping center. Separately, both the establishment of the "new" branch and the "move" of the old branch were permissible under state law.

The district court found the "package deal" to be impermissible. It found that in "[l]ooking to the realities of the situation, there was never any intention on the part of anyone that the 'new' Dartmouth branch would be other than a simple move of the [Telegraph-]Carlysle branch a short distance down the street, within the same economic area of small homes and modest businesses." This court affirmed the district court and agreed "that it is not legally permissible for the [bank and the OCC] to amend the Michigan branch banking restrictions 'by clever devices of evasion.'" *Dearborn,* 377 F.2d at 498; *see also American Bank and Trust Co. v. Saxon,* 373 F.2d 283, 291 (6th Cir.1967) (criticizing the OCC's efforts to evade the effect of Michigan law). Thus, in placing substance over form, we affirmed the district court's conclusion that "[i]t is abundantly clear that what was described as a move, was, in fact, the location (near the new shopping center) of a new branch, and that what was described as the establishment of a new branch was actually merely a move." *Dearborn,* 244 F.Supp. at 398.

In reviewing the substance of the instant transaction, we must consider what actually took place. The case law reveals that it is common for a bank to *relocate* its "main office" at or near the time of conversion, rather than choosing its "main office" without regard to relocation laws. For example, in *Traverse City,* a case relied upon by the OCC, the defendant bank converted to a national bank and kept its state "principal office" as its "main office." Just one

day after the conversion was approved, the bank applied to the OCC for a relocation of that office within the thirty-mile restriction. *Traverse City*, 228 F.Supp. at 988. Also, in *Marion Nat'l*, a case relied upon by the Commissioner, the defendant bank filed three contemporaneous applications to the OCC, similar to the applications in the instant case. In the first application the bank sought conversion to a national bank, and in the second application the bank sought "to move its head office to Marion, Indiana, and retain its present head office as a branch." *Marion Nat'l*, 418 F.2d at 122. The bank apparently presumed that the state "principal office" would automatically become the national "main office," as it used the term "head offices" to refer to both. *Id.* As a final example, in *First Nat'l Bank of Southaven v. Camp*, 333 F.Supp. 682 (N.D.Miss.1971), the subject bank converted to a national bank two years after it had started operations as a state bank. Eight months after the conversion it sought to relocate its "main office" under § 30 in order "to gain additional and more diversified business through more convenient service." *Southaven*, 333 F.Supp. at 684.

■ Looking to the substance, rather than the form, of the bank's application in the instant case, it is apparent that Society–Michigan actually sought to accomplish a relocation of its "principal office" upon conversion. As the Commissioner pointed out at oral argument, at every instant during this conversion this bank was either a state bank or a national bank. If it was a state bank at the point that it sought to establish its principal office in Bronson, then it was attempting to relocate its principal office from Ann Arbor to Bronson and Michigan law required that it obtain the Commissioner's approval to do so. If, on the other hand, it was by then a national bank, it was a national with its

principal office in Ann Arbor, and § 30(b) prevented it from moving that office more than 30 miles away. There is no statute that would support the OCC's finding that the bank could simply "designate" an office that would be suitable to facilitate its overall plan of multi-state branching. While the conversion of a bank and the *de novo* establishment of a bank may be similar in many respects, the one obvious difference is that the converted bank had been operating as a business and was required by state law to maintain a "principal office." That office does not automatically lose its distinction upon conversion. Michigan law provides that upon conversion, "the converted organization shall be deemed to be a continuation of the entity and of the identity of the converting organization." Mich. Comp. Laws § 487.435. Thus, the identity of the former is not destroyed.[12] Therein lies the critical difference between a *de novo* national charter and a national charter issued upon conversion.

The OCC argues that the terms "principal office" and "main office" are not legal counterparts, and that they may not be used interchangeably because the terms are only relevant within their respective bodies of law. The OCC explained this view in its decision below:

> The meaning of the term "main office," as used in section 30, is a product of federal law.... Accordingly, the term "main office," as used in section 30, has relevance only within the framework of the scheme of federal banking law. Likewise, the terms "principal office" and "main office," as used in Mich. Comp. Laws § 487.457, are relevant only within the context of Michigan banking law. Hence, the terms "main office" as used in 12 U.S.C. § 30, and "main office" or "principal office" as used in Mich. Comp. Laws § 487.457,

---

12. The bank's general counsel in his October 31, 1995 letter to the Commission regarding its purposes and intent in connection with the proposed moves, mergers, and retention of branches, recognized that under Michigan law "upon conversion, the new national bank [in Michigan] will be 'deemed to be a continuation of the entity and of the identity of the converting organization.'"

may not be used interchangeably. Thus, the designation of Bronson, Michigan as Society, N.A.-Michigan's "main office" cannot be regarded as a relocation of Society–Michigan's main office or principal office.

We disagree with that reasoning and find that it is not supported in the law. The OCC has offered no practical distinction between a state "principal office" and a national "main office," except for the fact that one arose out of state law and the other arose out of federal law. Thus, for our purposes, both the "principal office" in state law and the "main office" in federal law are counterparts that refer to a bank's "head offices" as distinguished from a bank's regular branch offices. *See Marion Nat'l,* 418 F.2d at 122 (using the term "head office" to refer to both the principal and main offices); *see also Ramapo Bank,* 425 F.2d at 341 (noting the distinctions between a "main office" and a branch office in the federal system).

■ It is unclear whether Society–Michigan should be deemed to have sought a relocation of its head office before the conversion (pursuant to state law) or after the conversion (pursuant to federal law). As is explained above, however, the relocation would be impermissible in either event. Therefore, because we deem this "designation" to be a *de facto* "relocation," we must reverse the district court's decision to grant summary judgment in favor of the OCC on this issue.

■ Even if such a designation were permissible, we find that the "designation" of the Bronson branch as the converted bank's "main office" was a fiction and a sham under the circumstances of this case. In looking to the substance of this designation, it is clear that Society–N.A. never intended to establish a "main office" at that location. As the Commissioner points out, the small Bronson branch was designated solely because it was within thirty miles of the next intended "main office" location in Angola, Indiana. In the second

application, filed contemporaneously with the Conversion Application, Society–N.A. sought to relocate the newly designated main office across state lines to Angola, Indiana, in order to merge with another bank. The Bronson "main office," or principal office, was never intended to operate in a "main office" capacity. The stated intent of this maneuver was to usurp and overrule the then-existing laws of the states that had not elected to "opt-in" to the provisions of the Riegle–Neal Act. As we found in *Dearborn,* it is not legally permissible for the OCC to amend the states' laws "by clever devices of evasion." *Dearborn,* 377 F.2d at 498.

The district court agreed with the OCC and rejected the Commissioner's argument that the Bronson branch did not constitute a *bona fide* "main office," holding that "[t]he National Bank Act does not require the Comptroller to consider the length of time a bank intends to locate its main office in the place designated. . . . [T]he Comptroller only is required to determine whether the designation complies with the statute. *See Ramapo Bank v. Camp,* 425 F.2d 333 (3d Cir.[1970] )." Without further discussing the *bona fides* of the situation, the court found that the designation was reasonable.

We find that the district court's reliance on *Ramapo Bank* is misplaced. In *Ramapo Bank,* a national bank sought to relocate its "main office" from a small town of about 5,200 to a larger town of over 47,000 about 2.7 miles away. The OCC approved the relocation, but banks that were already situated in the larger town challenged the relocation in district court, claiming that the move was in contravention of state law. The district court granted summary judgment in favor of the relocating bank, finding that § 30 was controlling and that § 36(c)(2) (the "McFadden Act") did not operate to limit "main office" relocations by reference to state law. *Ramapo,* 425 F.2d at 339 (quoting the district court). Though the Third Circuit affirmed the district court's decision that § 36(c)(2) was

inapplicable (a decision that will be discussed in Issue III.B. below), the court found that the *bona fides* of the relocation should be considered, and that it must first be determined that the application is not a sham or a subterfuge. *Id.* at 343–44 (citing *Traverse City*, 228 F.Supp. at 990–92). The court upheld the OCC's previous determination that the relocation was in fact *bona fide* based on the fact that the initial "main office" was overcrowded and that the bank needed to expand its main office facilities.

The important aspect of the decision in *Ramapo Bank* is that the court did not look merely to the form of the transaction, but it initially determined that the relocation was *bona fide*. "Plaintiffs [were not] deprived of an opportunity to pursue the question of whether the office to be established [ ] was to be a *bona fide* office." *Id.* at 347 (quoting the district court). The court noted the distinctions between a "main office" branch and an ordinary branch office:

> The distinctions between a main office and a branch office are bottomed primarily on various sections of the National Bank Act and include that a national bank has but one capital structure authorized to its main office, regardless of the number of branches; that no branch of a national bank has a board of directors; that residency requirements are imposed on the directors of a national bank in relation to the main office without regard to the location of branches; that the lending limitations of a national bank are based on the capital structure of a main office without regard to the number of branches; that no branch of a national bank has separate shareholders; that a branch may be closed at any time by a bank's board of directors without approval of either the shareholders or the Comptroller; and that a main office may be closed only by liquidation, merger, or receivership, all of which are complicated processes requiring approval of the bank's shareholders and/or authorization from the Comptroller.

*Id.* at 341 (quoting decision of the OCC). In *Ramapo*, the challenging banks did not dispute that the relocation was *bona fide* under those criteria. *Id.*

The OCC argues that Society–Michigan's attempt to designate Bronson as the converted bank's "main office" and then to relocate to Angola was not a sham, because the only question was whether the form of each step of the applications was "legally permissible." Even the immediate relocation of the "main office" under the plan from Bronson to Angola did not render this arrangement illegal. Indeed, in its brief, the OCC argues, n. 7, that a national bank does not have to conduct "operational functions" at its "main office." "Because a bank is not **required** to conduct the functions cited in the Comptroller's brief from the bank's main office, the failure to conduct those accounting and administrative functions at the bank's main office does not demonstrate that a properly designated main office is not *bona fide*."

We disagree. A totality of the circumstances is relevant to a inquiry into whether the establishment of a "main office" is *bona fide* or whether it is a sham. The designation of a branch in the small town of Bronson (population of about 2,300 in 1990), rather than using the state bank's branch in Ann Arbor (population of over 100,000 in 1990, including the well-recognized University of Michigan and its thousands of students) was intended for no purpose other than to circumvent the laws that otherwise prevented the multi-state branching scheme sought to be accomplished by Society–N.A. This sham location at Bronson is in contravention of the spirit of § 30. If this type of "technical" relocation were allowed, a bank would be able to relocate from branch to branch in a series of applications until the "main office" was close enough to an intended location across state lines. Neither the OCC nor the district court cites a previous case that permits this type of maneuver, and we are

convinced that Congress did not intend such a result.

In sum, then, we **REVERSE** the decisions of the OCC and the district court approving the designation of the Bronson branch as the converted bank's "main office." We deem the "designation" to have been in substance a "relocation" that would have been impermissible under either state or federal law. Furthermore, even if the bank were allowed arbitrarily to "designate" any branch bank as its national "main office," we would find that the designation in the instant case was, in substance, a sham designation made for the sole purpose of avoiding the applicable laws against multi-state branching.

Our conclusion on this issue requires us to reverse the district court's grant of summary judgment in favor of the OCC with respect to all three of Society–Michigan's applications. If the designation of Bronson was improper, then the relocation to Angola would not have been possible, and consequently the multi-state branching attempt could not have been accomplished. Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of the OCC, and **REMAND** to the district court with instructions to grant summary judgment in favor of the Commissioner for the reasons stated.

**B.** *Competitive Equality Considerations*

Alternatively, we reverse the district court's grant of summary judgment in favor of the OCC on the basis of competitive equality considerations.

As is explained above, the first application of Society–Michigan/Society–N.A. sought the OCC's approval to retain all of the bank's existing branches once it had converted to a national bank, and it also sought approval to establish the Ann Arbor branch (the former "principal office") as a regular branch office. The McFadden Act, passed in 1927 and amended by the Glass–Steagall Act of 1933 (codified at 12 U.S.C. § 36), specifically deals with the conditions upon which a national bank may retain or establish branch banks. The Act authorizes a converted national bank to retain branches in three ways. First, the bank may retain any existing branch that "might be established under subsection (c) of this section as a new branch," with the approval of the OCC. 12 U.S.C. § 36(b)(1)(A). Subsection (c) allows the establishment of new branches within the state in which the bank is "situated," if such establishment is authorized to state banks under state law. *See* 12 U.S.C. § 36(c). Second, the new bank may retain any branch that was a branch on the date of the enactment of the McFadden Act, February 25, 1927. 12 U.S.C. § 36(b)(1)(B) (the "grandfather clause"). Third, the bank may retain a branch unless a state bank resulting from a national-to-state conversion would be prohibited by state law from retaining as a branch an identically situated office. 12 U.S.C. § 36(b)(1)(C).[13]

---

13. Pertinent parts of § 36 are herein set forth:

    **§ 36. Branch banks**

    The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

    . . .

    **(b)(1)** A national bank resulting from the conversion of a State bank may retain and operate as a branch any office which was a branch of the State bank immediately prior to conversation if such office—

    **(A)** might be established under subsection (c) of this section as a new branch of the resulting national bank, and is approved by the Comptroller of the Currency for con-

tinued operation as a branch of the resulting national bank;

    **(B)** was a branch of any bank on February 25, 1927; or

    **(C)** is approved by the Comptroller of the Currency for continued operation as a branch of the resulting national bank.

    The Comptroller of the Currency may not grant approval under clause (C) of this paragraph if a State bank (in a situation identical to that of the national bank) resulting from the conversion of a national bank would be prohibited by the law of such State from retaining and operating as a branch an identically situated office

In applying the McFadden Act to the first application, the OCC determined that Society–N.A. could retain its existing branches after the conversion. Initially, the OCC found that the bank could retain three of the branches pursuant to the grandfather clause, because those branches had been established prior to February 25, 1927.[14] The OCC then reasoned that the remainder of Society–Michigan's branches could be retained pursuant to § 36(b)(1)(A) because, under Michigan law, a Michigan state-chartered bank could establish one or more branches within the state. With those findings, the OCC approved the bank's first application in total.

The OCC next addressed the bank's second application, the "Relocation Application," wherein Society–N.A. sought to relocate its "main office" across state lines to Angola, Indiana, retain all of its existing Michigan branches, and establish the Bronson branch (which would then be the former "main office") as a regular branch. The OCC found that, pursuant to the plain language of § 30, a national bank could relocate "to any other location within or outside the limits of the city, town, or village in which it is located," even if such relocation was across state lines. In addition, the OCC held that, once the reloca-

tion was approved, then the bank could retain all of the existing Michigan branches "as an implied, but necessary, adjunct to the express authority to move the main office." Pursuant to this so-called "implied retention" theory, the OCC authorized Society–N.A. to maintain branches in Michigan, even though the bank's "main office" was in Indiana. The district court found that the OCC's decision was reasonable and deferred to that determination, adopting the reasoning of the Fifth Circuit in a similar case, *Ghiglieri v. Sun World Nat'l Ass'n,* 117 F.3d 309 (5th Cir.1997).

The Commissioner now argues, as he did in the court below, that the OCC abused its discretion in approving Society–N.A.'s relocation and retention of branches. He claims that such approval resulted in a national bank having branches that it could not have established pursuant to § 36(c), because neither Michigan nor Indiana law permitted their state banks to branch across state lines.[15] Thus, in allowing a national bank to expand in a manner in which a similarly situated state bank could not, the OCC violated the doctrine of competitive equality that has developed in the case law since the enactment of the McFadden Act. In support of that position,

which was a branch of the national bank immediately prior to conversion.

. . .

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication imposed by the law of the State or State banks.

**14.** The OCC erroneously found that these branches qualified under the grandfather clause. In a letter dated April 5, 1996, the OCC issued a letter to the Assistant Attorney General stating that "[a]lthough the offices had existed before February 25, 1927 as independent banks, they did not become branches of any bank until after that date." The effect of the OCC's error regarding the grandfathered branches may destroy the OCC's argument, but we find it unnecessary to reach this conclusion.

**15.** As we stated above, Indiana had not "opted in" to interstate banking, and therefore Indiana state banks were not allowed to branch into Michigan. *See* IND.CODE ANN. § 28–2–13–19. Michigan allowed interstate branching, but it required reciprocity before a Michigan state bank could establish a branch in the other state; consequently, a Michigan state bank could not branch into Indiana. *See* MICH. COMP. LAWS § 487.471(7). Thus, in approving the relocation and the retention of the Michigan branches in this case, the OCC allowed Society–N.A. to accomplish that which a Michigan or Indiana state bank could not.

the Commissioner relies on the legislative history of the McFadden Act and on Supreme Court and lower court cases that have interpreted and applied that Act. A brief review of that history is helpful to an understanding of the Commissioner's position.

Between 1864 and 1927, national banks could operate out of only one central office in the state in which the bank was located. When state banks began establishing branch offices, national banks were placed at a competitive disadvantage and they became unpopular. *See* Henry N. Butler, *The Competitive Equality Doctrine and the Demise of Intrastate Bank Branching Restrictions,* 55 Tenn.L.Rev. 703, 706–07 (1988). Thus, in 1927, Congress passed the McFadden Act which allowed national banks to branch within a single city to the extent allowed by state banks. *See First Nat'l Bank of Logan v. Walker Bank & Trust,* 385 U.S. 252, 258, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). The purpose of the Act, according to representative McFadden, was to preserve the dual banking system by promoting "competitive equality" between national and state banks. *Id.* (quoting 68 Cong. Rec. 5815 (1927)); *see also* Butler, *supra,* at 707 & n. 22.

During the depression, bank failures caused the public to become disenchanted with the entire banking system. *See* David W. Regan, Comment, *Circumventing the McFadden Act: The Comptroller of the Currency's Efforts to Broaden the Branching Capabilities of National Banks,* 72 Ky. L.J. 707, 713 (1983). Many believed that bank failures were due to small undercapitalized banks, and that those small banks should be supplanted by larger, stronger banks. *Walker Bank,* 385 U.S. at 259, 87 S.Ct. 492. As Congress began debates over a bill to allow national banks to branch regardless of state law, the states began to liberalize their own branching laws. *See* Regan, *supra,* at 713. As more states permitted increased branching, national banks again began to face a competitive disadvantage. *See id.*

at 714. To remedy this predicament, Congress passed the Glass–Steagall Act in 1933, which amended the McFadden Act to allow national banks to branch within their respective states to the extent that the state laws permitted state banks to do the same. *See id.* Representative Glass and other members of Congress who voted in favor of the Glass–Steagall Act emphasized that the 1933 Act would "secure equal treatment for State banks." *Walker Bank,* 385 U.S. at 260, 87 S.Ct. 492 (quoting 77 Cong. Rec. 5862 (1933)). One member of the House reported that the Act was not meant to "go an inch beyond saying that [state banks and national banks] shall compete on equal terms and only where the States make the competition possible by letting their own institutions have branches." *Id.* (quoting 77 Cong. Rec. 5896 (1933)).

In *First National Bank of Logan v. Walker Bank & Trust,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), the Supreme Court extensively reviewed the legislative history of the McFadden Act and recognized that Congress intended "to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." *Id.* at 261. In that case, the Supreme Court analyzed whether national banks situated in Utah could open branch banks despite a Utah law indicating to the contrary. Under Utah branching laws, Utah state banks could not establish a branch except by taking over an existing branch that had been in operation for not less than five-years. *Id.* at 253, 87 S.Ct. 492. The national banks claimed that they were not subject to those particular laws and sought to establish new branches where there had been no established bank. The OCC agreed with the national banks and approved the banks applications. The Supreme Court reversed the OCC, relying on the doctrine of competitive equality. The Court stated that, in promulgating the McFadden Act as amended by the Glass–Steagall Act, "it appears beyond question

that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864." *Id.* at 261, 87 S.Ct. 492; *see also First Nat'l Bank v. Dickinson,* 396 U.S. 122, 131, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) ("Congress has deliberately settled upon a policy intended to foster competitive equality."); *Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank & Trust Co. of Fargo,* 554 F.2d 345, 353 (8th Cir.1977) ("The doctrine and policy of competitive equality is firmly imbedded in the Act and therefore relevant to the construction of its terms and the application of its provisions.").

The Commissioner argues that the doctrine of competitive equality, as codified in § 36(c), should prevent Society–N.A. from branching in the manner proposed because similarly situated state banks could not do the same. The Commissioner claims that the OCC has overstepped its boundaries in giving national banks greater branching rights than state banks, which has never been the intention of Congress. The McFadden Act was intended to *equalize* the playing field, not to give national banks an advantage. The Commissioner urges us to consider the "final result" of the plan, and not just each individual step, in determining whether the OCC's decision was permissible.

In affirming the OCC's decision, the district court relied heavily on the reasoning in *Sun World.* That case involved a Texas national bank's attempt to relocate its main office from El Paso, Texas, five miles away to Santa Teresa, New Mexico, and then retain the Texas branches and establish the former El Paso office as a branch. At the time, state banks in Texas and New Mexico could not branch into the other state. Nevertheless, the OCC approved the bank's plan in total. As in this case, the OCC found that the relocation was permissible on its face and that the bank enjoyed the implied authority to retain its established Texas branches pursuant to

the authority to relocate in § 30. The district court reversed, finding that although the relocation was permissible under § 30, the ability to retain the Texas branches was limited by § 36(c), which allows the retention of branches only to the extent that a state bank would be allowed the same opportunity. Because neither Texas nor New Mexico would have allowed such branching, the court found that the OCC had no authority to approve the retention of branches outside of New Mexico after the relocation. *Ghiglieri v. Sun World,* 942 F.Supp. 1111, 1116–1117 (W.D.Tex.1966).

The Fifth Circuit reversed the decision of the district court and found in favor of the OCC. *Sun World,* 117 F.3d at 316. The court initially agreed that the relocation to Santa Teresa, New Mexico, was authorized under § 30. *Id.* at 314. In determining whether the bank could retain its existing Texas branches after the relocation, the court found that Congress had not spoken to the issue. Following the rules of statutory construction set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court afforded great deference to the decision of the OCC and concluded that it had reasonably interpreted the statutes. *Sun World,* 117 F.3d at 314.

In support of its approval of the retention of the branches, the court noted that "Congress did not provide that lawfully established preexisting branches must be forfeited" upon relocation across state lines. *Id.* The court was unwilling to find that such a requirement would have been implied without more explicit language. *Id.* In addition, the court referred to the express provisions in the Riegle–Neal Act that specifically addressed the ability of a bank to retain offices after an out-of-state main office relocation. *See* 12 U.S.C. §§ 30(c) and 36(e).[16] Although the new

---

**16.** Section 30(c) provides:

In the case of a national bank which relocates the main office of such bank from

provisions did not apply prior to May 31, 1997, the court surmised that they indirectly supported the OCC's position because they limited the ability of a bank to retain branches after a main office relocation to another state. The court reasoned that "the imposition of a Congressional limitation on a national bank's authority is logical only if the banks already had the authority." *Id.* (citing *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257–59, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)). Finally, the court found that the Conference Report accompanying the adoption of the Riegle–Neal Act also supported the OCC's position. That report suggests that Congress was aware that the OCC had been allowing national banks to retain their existing branches after interstate relocations, and that the Riegle–Neal Act "amends the provision so that after June 1, 1997, a national bank relocating its main office to another state may maintain its branches in the first state only if those branches could have been established by a bank with its home State in the new State." *Id.* at 315 (quoting H.R. Conf. Rep. No. 651, 103d Cong., 2d Sess. 57 (Aug. 2, 1994), U.S. Code Cong. & Admin. News at 2068, 2078). The court held that, based on that Report, Congress looked favorably upon a national bank's retention of branches without reference to state law. *Id.*

Other courts have concluded that § 30 is not limited by § 36(c), and that, consequently, state law is irrelevant in determining whether a national bank may relocate to another place. *See Ramapo Bank v. Camp,* 425 F.2d 333, 336 (3d Cir.1970) (allowing bank to relocate main office and retain existing branches, concluding that § 30 should be interpreted without reference to § 36); *McEnteer v. Clarke,* 644 F.Supp. 290, 292 (E.D.Pa.1986); *Traverse City State Bank v. Empire Nat'l Bank,* 228 F.Supp. 984 (W.D.Mich.1964) (holding that federal relocation statute § 30, and not state law, governs the parameters under which a national bank may relocate its main office); *see also Ghiglieri v. Ludwig,* 125 F.3d 941, 943 (5th Cir.1997) (following *Sun World* under circumstances similar to that case). Other than *Sun World,* however, none of these cases directly addresses whether a national bank's ability to branch is limited by state law.

In *Ramapo Bank,* a national bank applied to the OCC to relocate its main office 2.7 miles away from Prospect Park, New Jersey, to Wayne, New Jersey. In a separate but simultaneous application, the bank sought approval for the retention of its former main office in Prospect Park as a branch pursuant to § 36(c). The problem with the bank's plan was that another bank had already established its main office in Wayne, and state law did not permit the establishment of branch offices by state banks in any municipality (other than where the main office is located) if another banking institution has its principal office located there. *Ramapo Bank,* 425 F.2d at 337. Because another bank had its main office located in Wayne, a relocation under § 30 would have allowed the bank to es-

1 State to another State after May 31, 1997, the bank may retain and operate branches within the State from which the bank relocated such office only to the extent authorized in section 36(e)(2) of this title.

Section 36(e)(2) provides:

> In the case of a national bank which relocates the main office of such bank from 1 State to another State after May 31, 1997, the bank may retain and operate branches within the State which was the bank's home State (as defined in subsection (g)(3)(B) of this section) before the relocation of such office only to the extent the bank would be authorized, under this sec-

tion or any other provision of law referred to in paragraph (1) to acquire, establish, or commence to operate a branch in such State if—

(A) the bank had no branches in such State, or

(B) the branch resulted from—

(i) an interstate merger transaction approved pursuant to section 1831u of this title; or

(ii) a transaction after May 31, 1997, pursuant to which the bank received assistance from the Federal Deposit Insurance Corporation under section 1823(c) of this title.

tablish a main office branch where a similarly situated state bank could not. Thus, the court was faced with determining whether § 30 relocation was limited by § 36(c) and the policy of maintaining competitive equality.

The Third Circuit held that the relocation under § 30 was permissible because § 30 was not expressly or impliedly limited by § 36(c). *Id.* at 348. The court found that the two statutes should not be read *in pari materia*, because the language in the statutes is unambiguous and "the sections have independent scope and purpose." *Id.* at 346. The court rejected the claim that principles of competitive equality prevented the relocation, because the competitive equality doctrine is only relevant with respect to branching under § 36(c). *Id.* Though the bank's second application regarding retention of the former main office was governed by § 36(c) and would have been limited by state law, the court did not discuss the propriety of the retention because the appellants conceded that if the relocation were found to be proper, then there would be no legal impediment to retaining, or creating, a branch office in Prospect Park. *Id.* at 344 n. 31.

The court in *Ramapo Bank* relied to a great extent on the decision in *Traverse City*, wherein the Michigan district court similarly found that relocation under § 30 was not limited by reference to state law through § 36(c). *Id.* at 344 (citing *Traverse City*, 228 F.Supp. at 992). *Traverse City* involved a state bank's attempt to relocate its main office from Empire, Michigan, to a location just north of Traverse City, Michigan. The Michigan state court found that the requisite "necessity" for the new branch was lacking, so the bank could not relocate under state law. To resolve this problem, the bank converted to a national bank and then, one day after the conversion was approved, sought relocation under § 30. At the same time, the bank sought to retain its former main office as a branch pursuant to § 36. *Id.* at 988. The court allowed the relocation, de-

spite the fact that state law prohibited it, because at the time it became fully converted to a national bank, it was no longer subject to the state's relocation limitations. *Id.* at 991–92. Though the court recognized that § 36 is expressly limited by state law, *id.* at 993, the court did not discuss whether state law posed any obstacle to the bank's retention of the former main office as a regular branch. It is noteworthy that *Traverse City* was decided before the Supreme Court decided *Walker Bank, supra,* pertaining to the competitive equality doctrine.

The Commissioner urges us to adopt the contrary view espoused in *Marion National Bank v. Van Buren Bank*, 418 F.2d 121 (7th Cir.1970), wherein the Seventh Circuit held that a national bank may not relocate and retain existing branches if the "package plan" would result in the creation of a branch or branches that would not be allowable under the applicable state law. *Id.* at 124. In *Marion National*, a state bank located in Van Buren, Indiana, sought to establish a branch bank in Marion, Indiana. Because state banking laws prohibited the establishment of that branch, the bank applied to the OCC to convert to a national bank, relocate its main office twelve miles away to Marion, and retain its existing Van Buren office as a branch. The Seventh Circuit rejected the holding in *Traverse City* and found that the bank's attempted maneuver was impermissible. *Id.* The court based its decision on the fact that the bank's proposal was "a single indissoluble process." *Id.* The court reasoned:

> An integral part of [the process] is that an existing unit bank will branch. The facility which will be subordinate and, in banking parlance, the "branch", will not be new. The facility which will be new will, by a quick twist, not be a "branch", but the head office. It will be located in a territory which a state bank could not lawfully enter via the establishment of a branch.

*Id.* The court refused to rule on the propriety of any individual step of the scheme, and it indirectly suggested to the bank that it modify its proposal to eliminate the request to retain the former main office as a branch. *Id.* at 125.

We are persuaded that the reasoning in *Marion National* best reflects the intention of Congress. Neither the district court nor the OCC discussed the concept of competitive equality, which was the impetus for the promulgation of § 36(c) and the basis for the Supreme Court's decision in *Walker Bank.* Although national bank relocations pursuant to § 30 are not explicitly limited by reference to state law, we believe that a scheme such as that in the instant case, where a § 30 relocation is sought solely to get around state law branching restrictions, violates the doctrine of competitive equality. Furthermore, even if a relocation itself were proper under § 30, there is no support for the retention of the branches in the former main office state or the operation of the former main office as a branch. Neither *Ramapo Bank* nor *Traverse City* dealt with the "implied retention" theory that the OCC has applied in this and other cases to facilitate the establishment of branches that would be unlawful under the applicable state's law. In point of fact, both *Ramapo Bank* and *Traverse City* recognized that the retention of the former main office branch was sought pursuant to § 36, and is presumably subject to the restrictions of that section. *See Ramapo Bank,* 425 F.2d at 336 (noting the "separate but simultaneous application" to retain former main office location as a branch pursuant to § 36(c)(2)); *Traverse City,* 228 F.Supp. at 988 (noting that the bank made application to retain the former main office as a branch "pursuant to 12 U.S.C.A. § 36").

Thus, even if we were to accept the proposition that § 30 is wholly independent from § 36(c), we would not conclude that a bank that relocates across state lines pursuant to § 30 necessarily has the implied right to retain all of its branches. Rather, we find that the retention of branches after a relocation would still be subject to state law via § 36(c) and the firmly embedded doctrine of competitive equality. This is particularly true where, as here, the bank is seeking to relocate its main office for no other purpose than to manipulate the federal laws so that it can avoid the limitations imposed by state law. *See First Nat'l Bank of Southaven v. Camp,* 333 F.Supp. 682, 689–90 (N.D.Miss. 1971) (concluding that, while a relocation itself may be permissible, the OCC may not approve a combination of applications that constitute an effort to evade the state's branching laws).

Neither the OCC nor the district court discussed the applicability of the doctrine of competitive equality because they concluded that § 30 is independent of § 36. The retention of branches, however, is governed by § 36, and thus is limited by state law. We reject the holding of the Fifth Circuit's decision in *Sun World,* and we conclude that there is simply no authority, in statute or applicable case law, for the OCC's "implied retention" theory. The doctrine of competitive equality is firmly embedded into the McFadden Act, which governs bank branching, and the relocation of a bank's main office does not expand on a bank's ability to branch under § 36(c)(2).

In conclusion, we note that although the cases discussed herein or cited by the parties may involve similar issues, none of them involve the type of grand scheme involved in this case. Here, a national bank is attempting to "designate" a main office location, while at the same time is asking for approval to "relocate" that office across state lines and retain all of the offices in the former main office state (including the former main offices); at the same time the bank will merge with another bank from the new main office state and retain its branches; and finally, in another series of applications, it plans to request approval to move to a third state with a consolidation of several banks and many

branches in that third state. The complex applications and master plan involved propose instantaneous steps and maneuvers that would equal the actions of a Fred Astaire or a Gene Kelley. We are convinced that, in light of Congress' explicit desire to equalize competition between national and state banks, Congress never intended for national banks to be able to branch in this manner. We believe that the new provisions of the Riegle–Neal Act, specifically §§ 30(c) and 36(e), evidence Congress' view that national banks never had the implied authority to relocate and retain branches as the OCC has concluded. We are further convinced that substance and not merely form must be examined in each case, and that consideration of competitive equality must be taken into account.

For the foregoing reasons, we **RE-VERSE** the district court's grant of summary judgment in favor of the OCC, and **REMAND** to the district court with instructions to grant summary judgment in favor of the Commissioner.