**Steve JOHNSON, Ph.D., Plaintiff,**

v.

**BANK OF BENTONVILLE, Defendant.**

**No. CIV.00–3026.**

United States District Court,
W.D. Arkansas,
Harrison Division.

Nov. 21, 2000.

Steven B. Davis, Davis & Goldie, Harrison, AR, for Plaintiff.

Allen W. Bird, II, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION

WATERS, District Judge.

This case is before the court for decision on cross-motions for summary judgment. The legal question to be determined is whether Congress exceeded the legislative authority given it by the Commerce Clause when it enacted § 731 of the Gramm–Leach–Bliley Financial Modernization Act of 1999, Pub.L. No. 106–102, codified at 12 U.S.C. § 1831u. Section 731 allows in-state banks, that is, banks chartered in Arkansas, to charge the same rate as any out-of-state bank that has a branch in the state.

The effect of this is to override the maximum lawful rate of interest set by Article 19, Section 13, of the Arkansas Constitution. Plaintiff contends § 731 must be struck down as an impermissible exercise of congressional power and the usury provisions of the Arkansas Constitution enforced.

### I. Background

The parties have stipulated to the following facts:

1. Plaintiff, Steve Johnson, is a citizen and resident of Mountain Home, Baxter County, Arkansas.

2. Defendant, the Bank of Bentonville, is a banking corporation organized and existing under the laws of the State of Arkansas, with its principal place of business in Bentonville, Benton County, Arkansas.

3. The defendant is a member of the Federal Deposit Insurance Corporation (FDIC), and its deposits are insured pursuant to 11 U.S.C. § 1811 *et seq.*

4. The defendant is a wholly owned subsidiary of the Arvest Bank Group, Inc., a bank holding corporation organized and existing under the laws of the State of Arkansas. Arvest Bank Group has its principal place of business in the State of Arkansas and owns an interest in banks located in the states of Oklahoma and Missouri. The defendant has branches in the states of Arkansas and Missouri.

5. On or about March 17, 2000, in the State of Arkansas, the plaintiff executed and delivered to the defendant his promissory note in the original principal sum of $5,000, bearing interest at a stated rate of 16.5% per annum.

6. The loan was for personal, family, and household use of the plaintiff.

7. The terms of the note were negotiated within the State of Arkansas, the proceeds were disbursed within the State of Arkansas, and the repayment of the note is to be made within the State of Arkansas.

8. Under the terms of the addendum of the note, the parties agreed that the note, and all provisions thereof, would be governed by the laws of the State of Arkansas and federal law, including but not limited to 12 U.S.C. § 1831u.

9. On or about March 24, 2000, the plaintiff drew his personal check in the sum of $60.00 payable to the Bank, in payment of an origination fee of $25.00, document preparation fee of $25.00, and an application fee of $10.00. The payment of these fees was required by the Bank before it would disburse the loan proceeds.

10. Under prior Arkansas supreme court rulings, the original, document preparation, and application fees constitute interest under Arkansas law. After deducting these fees, the true principal balance of this loan was $4,940.00.

11. If the net balance of the funds disbursed to the plaintiff from the original loan was $4,940, then the true annual percentage rate of interest charged by the defendant under the terms of the note is 17.915%.

12. At the time the note was made, the maximum legal rate of interest, if calculated pursuant to Article 19, Section 13 of the Arkansas Constitution was 10.5% per annum.

13. Under the provisions of Article 19, Section 13 of the Arkansas Constitution, the loan would be usurious and void as to principal and unpaid interest.

14. As of June 30, 1999, the total deposits of all branches of all commercial banks in Arkansas equaled $29.765 billion. Of that total $22.191 billion were held by branches of all banks chartered in Arkansas (hereinafter "In–State–Banks") and $7.574 billion were held by all branches of banks whose home states are not Arkansas, which had branches in Arkansas (hereinafter "Out–of–State Banks"). Thus, of all deposits held by all branches in the State, 25.37% were, on June 30, 1999, held by branches of Out–of–State Banks.

15. The total loans of all branches of In–State–Banks, as of June 30, 1999, equaled $15.757 billion. Thus 70.60% of all deposits held in the State by In–State–Banks, as of June 30, 1999, were outstanding as loans.

16. Assuming the same percentage of 70.60% loan to deposit ratio, as of June 30, 1999, the total loans of all Arkansas branches of Out–of–State Banks, equals $5.344 billion. As of June 30, 1999, branches of Out–of–State Banks made 25% of the total loans made by all banks doing business in Arkansas.

17. As of June 1999, there were 1,080 branches of commercial banks in the State of Arkansas. Of these branches 256 (or 24%) were branches of Out–of–State Banks.

18. As of March 17, 2000, branches of Out–of–State FDIC insured depository institutions had been established in Arkansas, pursuant to 12 U.S.C. § 1831u, by depository institutions chartered in the states of Alabama, North Carolina, Tennessee, Texas, Mississippi, and Ohio.

19. Arkansas is the only State of the United States which has a constitution which contains a provision which sets a maximum lawful annual percentage rate of interest on any contract at not more than 5 percent above the discount rate for 90–day commercial paper in effect at the Federal Reserve Bank for the Federal Reserve district in which such State is located.

20. Steve Johnson's highest attained college degree is a Doctor of Education in the field of computer training.

On May 23, 2000, in accordance with the provisions of 28 U.S.C. § 2403(a), this court directed a certification to the United States Attorney General notifying her that this case called into question the constitutionality of Section 731 of the Gramm–Leach–Bliley Act, Pub.L. No. 106–102, 12 U.S.C. § 1831u. On September 8, 2000, the court was notified that the United States would not intervene in this case.

## II. Discussion

In order to better understand the current constitutional challenge to § 731, it is perhaps necessary to briefly discuss the situation as it stood prior to the enactment of § 731. Article 19, Section 13, of the Arkansas Constitution, as modified by Amendment 60, provides in relevant part:

(a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.

(ii) All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.

(b) ... All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the General Assembly shall prohibit the same by law.

Ark. Const., art. 19, § 13.

■ The interest rate that national banking associations may charge is governed by federal law. *Marquette Nat'l Bank of Mpls. v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). Specifically, the National Bank Act, 12 U.S.C. § 85, allows a national banking association to charge interest at the rate allowed by the laws of the State where the bank is located.

The Supreme Court in *Marquette* determined that, for purposes of § 85, a bank was considered to be "located" in the State designated in its organization certificate. Thus, a national bank operating branch offices in Arkansas, or making loans within Arkansas, but considered to be "located" in some State other than Arkansas under § 85 could lawfully charge a rate of interest in excess of the maximum lawful rate of interest under the Arkansas Constitution. *See e.g., Wiseman v. State Bank & Trust, N.A.*, 313 Ark. 289, 854 S.W.2d 725 (1993). Meanwhile a State bank chartered in Arkansas, or a national bank "located" in Arkansas, would be bound by the maximum lawful interest rate under the Arkansas Constitution.

Historically in Arkansas, the branching of State banks was restricted to severe geographical limits. In January of 1999 statewide branching was first allowed. Similarly, other states liberalized "restrictions on branching by permitting inter-

state branches." *Financial Software Systems, Inc. v. First Union Nat. Bank,* 84 F.Supp.2d 594, 601 (E.D.Pa.1999).

"Between 1864 and 1927, national banks could operate out of only one central office in the State in which the bank was located. When State banks began establishing branch offices, national banks were placed at a competitive disadvantage and they became unpopular." *McQueen v. Williams,* 177 F.3d 523, 537 (6th Cir.1999) (citations omitted).

In order for national banks to remain competitive, Congress amended the banking laws. *Financial Software,* 84 F.Supp.2d at 601. The goal of such laws was "to preserve the dual banking system by promoting 'competitive equality' between national and State banks." *McQueen,* 177 F.3d at 537 (citations omitted). *See also, First National Bank of Logan, Utah v. Walker Bank & Trust Co.,* 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).

"The McFadden Act, passed in 1927 and amended by the Glass–Steagall Act of 1933 (codified at 12 U.S.C. § 36), specifically deals with the conditions upon which a national bank may retain or establish branch banks." *McQueen v. Williams,* 177 F.3d 523, 535 (6th Cir.1999). It, among other things, "permitted national banks to establish branches within a city on the same terms as State banks were permitted. The Banking Act of 1933 permitted intrastate banking on the same terms as State banks were permitted." *Financial Software,* 84 F.Supp.2d at 601 (citations omitted).

In 1994, Congress passed the Riegle–Neal Interstate Banking and Branching Efficiency Act of 1994, Pub.L. No. 103–328, 108 Stat. 2338 (1994). Riegle–Neal "permitt[ed] national banks to establish branch banks on the same terms that State banks were permitted to do so." *Financial Software,* 84 F.Supp.2d at 601. *See also* 12 U.S.C. § 36(c).

Riegle–Neal "establishes a framework for interstate branching" and allows national and State-chartered banks to open interstate branches. *McQueen,* 177 F.3d at 525. Riegle–Neal limited State control over interstate banks to specified areas such as community reinvestment, consumer protection, fair lending, and the establishment of intrastate branches. Local interest rates did not apply to loans made by branch banks authorized by Riegle–Neal. Instead, a State or national bank having an interstate branch in Arkansas would apply the maximum lawful interest rate of its home State. This was viewed as putting the banks having Arkansas as their home State at a disadvantage since the interest charged by those banks would be subject to the maximum lawful rate of interest allowed in Arkansas.

On November 12, 1999, President Clinton signed the Gramm–Leach–Bliley Act of 1999, Pub.L. No. 106–102, which reformed the laws that define and regulate the structure of the financial services industry. The particular aspect of the Act of interest in this case is § 731 which amended section 44 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831u. The new subsection codified as 12 U.S.C. § 1831u(f) provides as follows:

(f) Applicable rate and other charge limitations

(1) In general

In the case of any State that has a constitutional provision that sets a maximum lawful annual percentage rate of interest on any contract at not more than 5 percent above the discount rate for 90–day commercial paper in effect at the Federal reserve bank for the Federal reserve district in which such State is located, except as provided in paragraph (2), upon the establishment in such State of a branch of any out-of-State insured depository institution in such State under this section, the maximum interest rate or amount of interest, discount points, finance charges, or other simi-

lar charges that may be charged, taken, received, or reserved from time to time in any loan or discount made or upon any note, bill of exchange, financing transaction, or other evidence of debt by any insured depository institution whose home State is such State shall be equal to not more than the greater of—

> (A) the maximum interest rate or amount of interest, discount points, finance charges, or other similar charges that may be charged, taken, received, or reserved in a similar transaction under the constitution or any statute or other law of the home State of the out-of-State insured depository institution establishing any such branch, without reference to this section, as such maximum interest rate or amount of interest may change from time to time; or
>
> (B) the maximum rate or amount of interest, discount points, finance charges, or other similar charges that may be charged, taken, received, or reserved in a similar transaction by a State insured depository institution chartered under the laws of such State or a national bank or Federal savings association whose main office is located in such State without reference to this section.

(2) Rule of construction

No provision of this subsection shall be construed as superseding or affecting—

> (A) the authority of any insured depository institution to take, receive, reserve, and charge interest on any loan made in any State other than the State referred to in paragraph (1); or
>
> (B) the applicability of section 1735f–7a, 85, or 1831d of this title.

12 U.S.C. § 1831u(f).

The amendment was designed to provide for loan pricing parity among interstate and local banks. "Specifically, if an interstate bank can charge a particular interest rate, then a local bank in the State into which the interstate bank has branched, may charge a comparable rate." H.R. Conf. Rep. 106–434 discussing § 731.

Plaintiff contends § 731 violates the principles of dual sovereignty inherent in our federal system. He argues that § 731 goes beyond the legislative power granted Congress in the Commerce Clause.

■ The dual State and national banking system has been referred to as "an accident of history and the result of the continuing tension between two structures of government." *First Union Nat. Bank v. Burke,* 48 F.Supp.2d 132, 136 (D.Conn. 1999) (citations omitted). "Because national banks are considered federal instrumentalities states may neither prohibit nor unduly restrict their activities." *First Nat. Bank of Eastern Arkansas v. Taylor,* 907 F.2d 775, 778 (8th Cir.1990) (citation omitted). State law is, however, applicable to national banks in a variety of ways.

With respect to State chartered banks, Congress has, either by exercising its powers under the Commerce Clause to regulate the national economy or by virtue of its position as a deposit insurer, preempted State laws including State usury laws. For instance, the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub.L. No. 96–221, 94 Stat. 132, contains five separate preemptions of State usury limits. *In re Lawson Square, Inc.,* 816 F.2d 1236, 1238 (8th Cir. 1987). These preemptive provisions as applied to intrastate loans have been upheld against Commerce Clause challenges. *See e.g., Brown v. Investors Mortgage Co.,* 121 F.3d 472, 476 (9th Cir.1997) (commercial activity of making intrastate loans substantially related to interstate commerce and Congress made specific findings that modification of State usury laws was necessary for a stable national financial situation).

Federal banking law has been held to preempt Arkansas usury law in a variety of situations. For instance, in *Stephens Security Bank v. Eppivic Corp.*, 411 F.Supp. 61 (W.D.Ark.1976), the court ruled that a provision of the Federal Deposit Insurance Act, 12 U.S.C. § 1833a, preempted Arkansas usury law with respect to the maximum interest rate that could be charged by FDIC insured State banks on business and agricultural loans exceeding $25,000. In *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998), the Arkansas Supreme Court held that section 501 of the DIDM-CA preempted Arkansas usury law if the loan met certain conditions. *Nelson*, 334 Ark. at 176–177, 971 S.W.2d 777. Specifically, the court held § 501(a)(1), codified at 12 U.S.C. § 1735f–7a(a), preempted State usury law when a loan is secured by a first lien on residential real property. *See also Troutt v. First Fed. Sav. & Loan Ass'n of Hot Springs*, 280 Ark. 505, 659 S.W.2d 183 (1983)(same); *Rhode v. Kremer*, 280 Ark. 136, 655 S.W.2d 410 (1983)(federal preemption of Arkansas usury law when a loan was secured by a lien on a mobile home— § 501(c) of the DIDMCA).

It appears no court has yet faced a Commerce Clause challenge to the particular section at issue in this case. The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, "permits Congress to enact legislation that supersedes all State and local law." *Campbell v. Minneapolis Public Housing Authority*, 168 F.3d 1069 (8th Cir.1999) (*citing, City of New York v. FCC*, 486 U.S. 57, 63, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988) ("When the Federal Government acts within the authority it possesses under the Constitution, it is empowered to preempt State laws to the extent it is believed that such action is necessary to achieve its purposes.")).

■ As the Eighth Circuit noted in *Sears, Roebuck and Co. v. O'Brien*, 178 F.3d 962 (8th Cir.1999):

Under the Supremacy Clause of the Constitution, whether a federal law preempts a State law generally turns on the answers to four questions. Is the State law explicitly preempted by the federal law? Is the State law implicitly preempted by the federal law because Congress has regulated the entire field? Is the State law implicitly preempted because compliance by a private party with federal and State law is impossible? Is the State law implicitly preempted because it creates an obstacle to accomplishment and execution of the full purpose of federal law?

*Id.* at 966.

■ Here, the express language of § 731 shows Congress explicit intent to preempt State law. The question therefore becomes whether Congress acted within its legislative power under the Commerce Clause in doing so.

We believe it did. The Interstate Commerce Clause gives Congress the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. The Supreme Court has:

identified three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995) (citations omitted). Within the final category, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.*, 115 S.Ct. at 1630.

As the Supreme Court in *Lopez* noted, it has "upheld a wide variety of congressional Acts regulating intrastate economic ac-

tivity where we have concluded that the activity substantially affected interstate commerce." *Lopez,* 115 S.Ct. at 1630. Although Congress in enacting § 731 made no specific findings that modification of State usury laws was necessary, we nevertheless believe Congress acted within its Commerce Clause authority when it preempted State usury laws in connection with the commercial activity of FDIC insured banks making intrastate loans. Section 731 furthers the goal of competitive equality between state and national banks. If the usury limit were not preempted, banks located in Arkansas will suffer a competitive disadvantage because of (1) the usury limit; and (2) an inability to charge other fees, such as those charged in this case, that are considered to be "interest" by the Arkansas state courts. The intrastate loan at issue in this case is substantially related to interstate commerce.

### III.  Conclusion

For the reasons stated, we find that Congress has the authority under the Commerce Clause to override Arkansas' usury law with respect to FDIC insured banks in Arkansas. Defendants' motion for summary judgment will be granted by a separate order entered concurrently herewith.